# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| REGIS LUTHER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 15 C 3120 |
| | ) |
| NAVISTAR INTERNATIONAL CORPORATION, et al., | ) Judge Rebecca R. Pallmeyer |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Regis Luther is a former executive at Navistar International Corporation, a manufacturer of commercial trucks headquartered in Lisle, Illinois. Luther worked for Navistar from September 2009 until he was terminated in June 2014. Pursuant to Navistar's Executive Severance Agreement ("ESA"), Luther received a severance package upon his termination, including $711,450 in "severance pay." In order to collect those funds, Plaintiff signed a "General Release" on August 13, 2014, waiving, with limited exceptions, "any and all claims" against his former employer. But Luther now believes that Navistar "did not pay him the full amount of benefits that it owed him under the ESA." He filed suit in the Circuit Court of DuPage County, Illinois in March 2015, seeking to recover amounts that he alleges Navistar owes him in the form of additional severance pay and retirement benefits.

Navistar removed the case to this court, and Plaintiff has filed an amended complaint against three defendants: Navistar International Corporation; Navistar, Inc.; and Navistar Supplemental Executive Retirement Plan (collectively, "Defendant" or "Navistar"). (Am. Compl. [44] at 1.) The amended complaint includes two counts, both brought under the Employee Retirement Income Security Act ("ERISA"): Count 1 seeks "Recovery of Benefits Owed" (i.e., additional severance pay and retirement benefits) under 29 U.S.C. § 1132(a)(1)(B); Count 2 accuses Defendant of "Interference with Protected Rights" (i.e., that Defendant fired Luther to

avoid paying him benefits that otherwise would have been owed) under 29 U.S.C. § 1140. Plaintiff filed a motion for partial summary judgment on the issue of additional severance under Count 1. That motion is now fully briefed. Defendant filed a cross-motion seeking summary judgment on both counts. Before that motion was fully briefed, the parties agreed to stay proceedings pending the court's resolution of the threshold issue of whether the General Release bars Luther's claims. For the reasons articulated below, the court finds that Luther has waived the claim raised in Count 2, but preserved the claims of Count 1. Because Luther's claim for additional severance is disputed, his motion for summary judgment on that claim [54] is denied. Count 2 of his Amended Complaint is dismissed.

## BACKGROUND

In September 2009, Luther left his position as Vice President of Engineering at a British aerospace company to join Navistar. (Def.'s Resp. to Pl.'s R. 56 Statement [63], hereinafter "Def.'s Resp. to Pl.'s R. 56," ¶ 8.) Luther initially served as Navistar's Vice President of Military Products and Initiatives, but was promoted on November 1, 2011 to a new position: Vice President of Portfolio Planning and Program Management. (*Id.* ¶¶ 9-10.) He remained in that role until his termination in June 2014. The record does not reveal the reason for Plaintiff's termination other than to say that it was not for cause. (Def.'s R. 56 ¶ 41.) On the day he was promoted in November 2011, Luther entered into an Amended and Restated ESA. (*Id.* ¶ 12.) This version of the ESA was a new iteration of previous agreements between the parties, one from September 2009 and another from January 2010. (*Id.* ¶ 15.)

The November 2011 ESA spelled out the severance and retirement benefits Luther was entitled to in the event of his termination. To "assure stability and continuity," the ESA guaranteed Luther additional severance and retirement benefits if Navistar terminated his employment amid a "change in control" at the company. The ESA identified two different tiers of changes in control, corresponding to different sets of severance and retirement benefits: a

2

"standard" change in control, and a "409A change in control," in reference to Section 409A of the Internal Revenue Code, 26 U.S.C. § 409A.

A standard change in control occurs in any of the following four circumstances: (a) any person or group first becomes the "beneficial owner" of twenty five percent or more of the combined voting power of Navistar's outstanding securities; (b) a significant turnover among the Board of Directors; (c) "[a]ny complete dissolution or liquidation of the Company"; or (d) "a merger or consolidation of the Company." (Executive Severance Agreement, Ex. A to Pl.'s Am Compl. [44], hereinafter "ESA," ¶ 3.) Only the second of these is at issue here. Specifically, the composition of the Board could trigger a change of control if

> the following individuals cease for any reason to constitute more than three-fourths (3/4) of the number of directors then-serving on the Board of Directors of the Company (the "Board"): individuals who constitute the Board as of [November 1, 2011] and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, concluding, but not limited to, a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved by the vote of at least two-thirds (2/3) of the directors then still in office or whose appointment, election, or nomination was previously so approved.

(*Id.* ¶ 3(b).)

Section 409A of the Internal Revenue Code Regulations identifies three circumstances under which a change in control may occur for purposes of the tax code: (1) a change in ownership (a person or group comes to own fifty percent or more of the total fair market value or voting power of a corporation's stock); (2) a change in effective control (a person or group acquires thirty percent or more of a corporation's voting power, or a majority of the board of directors is replaced during any twelve-month period by directors whose appointment or election is not endorsed by a majority of the board prior to the date of the appointment or election); or (3) a change in the ownership of a substantial portion of assets (a person or group acquires assets totaling forty percent or more of the total assets of the corporation within a twelve-month period). 26 C.F.R. § 409A.

These three types of termination—one not associated with a change in control, one associated with a standard change in control, and one associated with a 409A change in control—each trigger different benefits packages under the ESA. A non-change-in-control termination entitled Luther to 150% of his salary, plus his "annual incentive target," which appears to be an annual performance bonus. (*Id.* ¶ 5(a).) If Navistar terminated Luther within 36 months after either a standard or 409A change in control, however, the ESA guaranteed him 200% of his salary, in addition to the annual incentive target. (*Id.* ¶ 5(b).)

In addition to increased severance pay, a 409A change-in-control termination would also accelerate Luther's eligibility for certain retirement benefits under Navistar's Supplemental Executive Retirement Plan ("SERP"). Generally, an executive who is terminated for reasons other than cause is eligible for partial SERP benefits on his "early retirement date," defined as "the first day of the month prior to [the employee's] attainment of age 55 and completion of 5 years of [service at Navistar]." (Ex. A to Def.'s Cross-Mot. for SJ [67], hereinafter "SERP," ¶ 1.9; Def.'s R. 56 Statement [66] ¶ 7.) If, however, the executive's termination takes place within twenty four months of a 409A change in control, he may receive a "supplemental payment" for a portion of his accrued SERP benefits without reaching those milestones. (ESA ¶ 5(iii).) Specifically, the executive's accrued benefits, in the event of a 409A change-in-control termination, are "determined after giving the Executive three (3) additional years of age and pension service credit." (*Id.*)

Navistar terminated Luther's employment effective June 30, 2014. (Def.'s Resp. to Pl.'s R. 56 ¶ 38.) At the time of his termination, Luther was six months shy of his fifty-fifth birthday and roughly three months away from reaching five years of service. Pursuant to the ESA, Defendant offered Luther $711,450 in severance pay—an amount reflective of a non-change-in-

4

control termination.[1]  To receive any severance, however, the ESA required Plaintiff to first sign a General Release (the "Release"), waiving, with limited exceptions, any claims he had against Defendant.  (ESA at 1 ("This Agreement shall not become effective prior to the execution of a written release agreement . . . .").)  Before signing the Release, Plaintiff made several attempts to negotiate its terms.  Through counsel, Luther requested that Defendant deem him eligible for SERP benefits.  (Ex. B-42 to Def.'s Cross-Motion for SJ [67].)  Navistar refused.  (Ex. B-43 to Def.'s Cross-Motion for SJ.)  It pointed out that Luther did not meet either of the two criteria for SERP eligibility: he was neither 55 years old, nor did he have 5 years of service at Navistar at the time of his termination.  (*Id.*)

Plaintiff responded by requesting a carve-out from the Release that would explicitly allow him to pursue his SERP claim.  (Ex. B-49 to Def.'s Cross-Motion for SJ.)  His attorney noted that, without such a carve-out, Luther "would waive all rights to any legal remedy against Navistar for any claim, including his SERP." (*Id.*)  Navistar again refused, and warned Plaintiff that if he failed to sign the Release by August 14, 2014, he would lose his severance pay.  (Ex. B-52 to Def.'s Cross-Motion for SJ.)  Plaintiff relented, signing the Release on August 13, 2014.  (Ex. B 53 to Def.'s Cross-Motion for SJ.)  But in the cover letter attached to the signed Release he sent to Navistar, Plaintiff's attorney noted that "we are continuing to research whether or not he can pursue the SERP benefits even after having executed the General Release." (*Id.*)  Navistar objected to Plaintiff's continued research in an e-mail dated August 18, 2014, warning Luther that "he would not be entitled to [his severance pay] if he took actions inconsistent with the representations and warranties contained in the General Release."  (Ex. B-54 to Def.'s Cross-Motion for SJ.)  If Luther planned to litigate his eligibility for SERP benefits, Navistar suggested, he should revoke his acceptance of the Release prior to the August 20, 2014

---

[1] Luther's salary at the time of his termination was $306,000.  (Ex. B-25 to Def.'s Mem.)  That figure multiplied by 150% equals $459,000.  Plaintiff's annual incentive target was $252,450.  The sum of these two amounts is $711,450.

deadline for doing so. (*Id.*) Luther's attorney responded via e-mail the next day, arguing that Navistar was "obligated to pay Regis Luther the undisputed retirement amounts," and clarifying that "we are continuing to investigate whether or not Mr. Luther can make a claim against the SERP despite him having signed the release **without qualification**." (Ex. B-55 to Def.'s Cross-Motion for SJ (emphasis in original).)

Luther never revoked his acceptance of the Release, and Navistar paid him $711,450 in severance. (Def.'s Resp. to Pl.'s R. 56 Statement [81] ¶ 38 ("Plaintiff does not dispute receiving the payment.").) Throughout this negotiation period, neither party mentioned the ESA's change-in-control provisions, nor did Plaintiff challenge the severance pay calculation.

Seven months later, Luther filed suit in the Circuit Court of DuPage County, alleging a single breach-of-contract claim. The state-court complaint alleged that a "change in control" occurred in 2012 when five of the ten seats on the Board changed hands without the approval of two-thirds of the Board and, therefore, Navistar owes him an additional $349,350 in severance pay. The suit also sought millions of dollars in additional SERP retirement benefits. (State-Court Compl., Ex. 1 to Notice of Removal [1]; Pl.'s Mem at 3; Am. Compl. at 10.) Navistar removed the suit to this court, arguing that Luther's claim "is completely preempted by [ERISA]."[2] (Notice of Removal [1] at 1.) Plaintiff effectively conceded preemption by filing an amended complaint, separating his claims into two counts, both of which arise under ERISA: Count 1 seeks "Recovery of Benefits Owed" under 29 U.S.C. § 1132(a)(1)(B). In it, Plaintiff

---

[2] Navistar is correct:

> Complete preemption, really a jurisdictional rather than a preemption doctrine, confers exclusive federal jurisdiction in certain instances where Congress intended the scope of a federal law to be so broad as to entirely replace any state-law claim. ERISA is such an area: "[T]he ERISA civil enforcement mechanism is one of those provisions with such extraordinary pre-emptive power that it converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule."

*Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Trust Fund*, 538 F.3d 594, 596 (7th Cir. 2008) (quoting Aetna Health Inc. v. Davila, 542 U.S. 200, 209 (2004)).

alleges facts that would trigger both a standard and a 409A change in control, which would render Plaintiff eligible for a supplemental SERP payment and additional severance pay. Count 2 accuses Defendant of "Interference with Protected Rights" (i.e., that Defendant fired Luther to avoid paying him benefits that otherwise would have been owed) under 29 U.S.C. § 1140. (Am. Compl. [44].) Plaintiff filed a motion for partial summary judgment on his claim for additional severance under Count 1. That motion is now fully briefed. Defendant filed a cross-motion seeking summary judgment on both counts, but before that motion was fully briefed, the parties agreed to stay proceedings pending the court's resolution of the threshold issue of whether the General Release bars Luther's claims.

## DISCUSSION

**1.    Legal standard**

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment should be granted when the record as a whole shows that a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003).

The only question presented here is one of contractual interpretation. "In interpreting the language of an ERISA-governed plan," such as the ESA, "[the court] appl[ies] the federal common law rules of contract interpretation." *Cent. States, Se. & Sw. Areas Pension Fund v. Waste Mgmt. of Michigan, Inc.*, 674 F.3d 630, 634 (7th Cir. 2012); *see Kamler v. H/N Telcom Servs.*, 305 F.3d 672, 680 (7th Cir. 2002). "Those principles require that Plan terms be interpreted in 'an ordinary and popular sense, as [they] would [be understood by] a person of average intelligence and experience.'" *Sellers v. Zurich Am. Ins. Co.*, 627 F.3d 627, 632 (7th Cir. 2010) (alteration in original) (quoting *Cannon v. Wittek Co. Intern.*, 60 F.3d 1282, 1284 (7th

Cir. 1995)); *see also Renaldi v. Sears Roebuck & Co.*, No. 97 C 6057, 2001 WL 290372, at *17 (N.D. Ill. March 21, 2001) (applying this method in the interpretation of a "General Release and Waiver Agreement").

**2.     The General Release bars Count 2 but not Count 1**

Defendant argues that, by signing the Release, Plaintiff has waived the claims asserted here. (Def.'s Resp. [62] at 7.) ERISA claims may be waived by a release where the release is signed knowingly and voluntarily. *Hakim v. Accenture*, 718 F.3d 675, 684 (7th Cir. 2013). Plaintiff does not dispute the validity of the Release; rather, he argues that the Release preserves the claims presented in this suit.

The language of the Release appears broad and comprehensive: Its first two paragraphs of the Release state that "in exchange for . . . the Company's full satisfaction of all payments and benefits due to [Luther] under the Executive Severance Agreement, as set forth on Schedule 2 hereto**,** . . . [Luther] hereby waive[s] . . . any and all claims or causes of action[,] arising on or before the date of this Release[,] includ[ing] those arising under . . . ERISA." (Ex. F to Pl.'s R. 56 [55], hereinafter "General Release," ¶¶ 1-2 (emphasis in original).) The General Release also clarifies that, it "constitutes the only agreement between the parties respecting the subject matter hereof, and supersedes all prior and contemporaneous agreements . . . between the parties." (*Id.* ¶ 20.)

Despite this language, Luther argues that he is entitled to sue Navistar for additional severance pay and retirement benefits based on Paragraph 5(g) of the General Release. Paragraph 5 lists numerous exceptions to the document's waiver provisions, and subsection (g) in particular preserves Luther's "right to enforce the terms of the Executive Service Agreement."

8

(*Id.* ¶ 5(g).)[3] The ESA spells out the terms of the SERP and Luther's severance benefits. As Plaintiff sees things, his claims in this suit—which attempt to litigate the application of the ESA—seek to "enforce the terms of the ESA," and are therefore preserved.

Navistar disagrees. It offers two arguments in support of its position. First, it points to Luther's attorney's admission that, by signing the Release, his client "would waive all rights to any legal remedy against Navistar for any claim, including his SERP." (Def.'s Cross-Motion for SJ at 10 (citing Ex. B-49 to Def.'s Cross-Motion for SJ).) According to Navistar, this statement shows that Plaintiff knew that none of his claims would survive his signing of the Release. But this language, offered in the midst of negotiations between the parties, has little bearing on the court's interpretation of the contract at issue. For one thing, the letter constitutes extrinsic evidence that may not be considered if the court finds the language of the contract to be unambiguous. *Bland v. Fiatallis North American, Inc.*, 401 F.3d 779, 783 (7th Cir. 2005). Even if the language here is open to multiple interpretations, however, the record shows that Plaintiff never believed that the Release categorically barred all of his claims, as evidenced by the fact that he "continu[ed] to research whether or not he can pursue the SERP benefits even after having executed the General Release." (Ex. B 53 to Def.'s Cross-Motion for SJ.)

Second, Navistar argues that "Paragraph 5(g) is not applicable." (Def.'s Resp. at 9.) As it reads the Release, Paragraph 5(g) merely protects Plaintiff's right to sue in the event that Navistar failed to make good on the severance payments identified in Schedule 2. (*Id.* at 10 n.10.) Schedule 2, subtitled "Executive General Severance Summary," was also attached to a

---

[3] Luther contends that a separate document he signed, along with the ESA, in November 2011 also preserves his claims. (Pl.'s Mem. at 1.) That document, the "Form of Release Agreement," contains language very similar to that found in the General Release. In it, Luther waived "any and all . . . claims . . . against [Navistar]" in exchange for the "obligations set forth in the Executive Service Agreement." (Form of Release Agreement, Ex. E to Pl.'s R. 56 ¶ 1.) But the Form of Release Agreement also states that "nothing in this Release Agreement shall release or impair [Luther's] right to enforce the terms of the Executive Severance Agreement." (Id.) The Form of Release Agreement is irrelevant here, given that (a) its relevant language is functionally identical to the General Release, and (b) the General Release superseded any previous agreements between the parties. (General Release ¶ 20.)

letter from Navistar to Luther dated May 29, 2014. (Ex. B-41 to Def.'s Cross-Motion for SJ.) It identifies Luther's severance pay as $711,450, but it is silent as to his SERP eligibility. Based on this theory, Defendant concludes that "[b]ecause Plaintiff received his ESA separation payment as offered, there is nothing left to enforce as to his separation pay." (Def.'s Resp. at 10.)

Defendant's reading of the Release is unconvincing. If Paragraph 5(g) merely allowed Plaintiff to recover the benefits promised in Schedule 2, why does Paragraph 5(g) refer to the ESA generally rather than specifically citing to Schedule 2? Furthermore, what purpose would the identical carve-out language in the Form of Release Agreement serve under Defendant's interpretation? The more plausible reading of the General Release is that it allows Plaintiff to litigate issues related to the obligations defined in the ESA more broadly. The question, then, is whether Plaintiff's claims in this suit fall under that heading.

### A. The Release preserves the claims in Count 1

The claims alleged in Count 1 clearly seek to "enforce the terms of the [ESA]." In this count, Plaintiff alleges that, under the ESA, (1) he is owed additional severance because he was fired during a change in control as defined by the ESA, and (2) he is eligible for SERP benefits under the terms of the ESA. Regardless of whether these claims have merit, they turn on the proper application of the ESA. They are therefore preserved under Paragraph 5(g) of the Release.

### B. The Release bars Count 2

Count 2, which alleges that Navistar terminated Plaintiff to avoid owing him certain benefits, is a different matter. Nothing in the terms of the ESA prohibit Navistar from firing Plaintiff to avoid the payment of benefits. Plaintiff's claim arises under ERISA, not the parties' contractual agreement. But by signing the Release, Luther has waived all claims, including ERISA claims, except those carved out under Paragraph 5 of the Release. *See Hakim*, 715 F.3d at 684 (finding that waiver of ERISA claims is valid if knowingly and voluntarily made).

Count 2 does not fall under any of those exceptions. Plaintiff is therefore barred from raising this claim.

The court acknowledges, however, that due to the limited scope of Plaintiff's partial summary judgment motion, he has not yet addressed this issue directly. If he believes that Count 2 falls under Paragraph 5(g) of the Release as interpreted here, he will have leave to argue that Count 2 should survive Defendant's cross-motion for summary judgment. Any such argument should be included as part of Luther's response to Defendant's motion, which is due within thirty days of this order.

**3. Luther is not entitled to summary judgment on the severance claim in Count 1**

Plaintiff has moved for summary judgment on his severance pay claim under Count 1, which alleges that Navistar owes Plaintiff additional severance pay pursuant to the ESA. This claim relies on Plaintiff's assertion that he was fired amid a change in control.[4] The ESA describes several circumstances in which a standard change in control may occur, but only one is relevant to Plaintiff's claim: a more-than-twenty-five-percent turnover among the Board of Directors, where the new directors are not approved by the existing Board.[5]

---

[4] Although Plaintiff's complaint alleges that a 409A change in control occurred, only a standard change in control would be required to trigger the additional severance that Luther seeks. The court accordingly assesses his claim as one predicated on a standard change in control.

[5] Quoted above, Paragraph 3(b) of the ESA provides that a change in control occurs under the following circumstances:

> the following individuals cease for any reason to constitute more than three-fourths (3/4) of the number of directors then-serving on the Board of Directors of the Company (the "Board"): individuals who constitute the Board as of [November 1, 2011] and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, concluding, but not limited to, a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved by the vote of at least two-thirds (2/3) of the directors then still in office or whose appointment, election, or nomination was previously so approved.

Plaintiff alleges that a change in control occurred in 2012—less than thirty six months before his termination—because "five Directors left Navistar's Board of Directors" that year. (Am. Compl. ¶ 49.) Navistar disputes this allegation. According to the declaration of Navistar's corporate secretary Curt Kramer, each of these new directors was unanimously approved by existing board members, and none assumed office "in connection with an actually or threatened election contest." (Kramer Decl. ¶ 29 ("Every individual who became a new member of the Board between November 1, 2011 and June 30, 3014 was unanimously appointed to the Board, or nominated for election to the Board at the NIC annual stockholder meetings . . . by the Board Members who were then serving on the Board.") Kramer's declaration also states that, during the relevant time period, no actual or threatened election contest occurred. (*Id.* ¶ 30.)

In his response to Defendant's Rule 56 Statement, Plaintiff did not rebut these submissions, but rather responded that these facts are "Unknown," and that he "requires further discovery to respond." (Pl.'s Resp. to Def.'s R. 56 Statement ¶¶ 18–19.) He does not, however, explain what further discovery could be required, nor does he indicate what additional information might assist his claim. In addition to Kramer's declaration, Defendant has provided reputable documentation listing the slate of directors for election at each relevant annual stockholder meeting (Exs. D-36–39 to Def.'s Cross-Motion for SJ), and the minutes of each Board meeting approving each new director during that time. (Exs. D-6, D-16–18, D-22, D-24–25, D-36–39 to Def.'s Cross-Motion for SJ.)

What's more, Plaintiff's memorandum in support of his motion for summary judgment does not even contend that the new directors who took office after November 1, 2011 were not approved by a two-thirds majority of the Board. Rather, he relies on an apparent misunderstanding of the ESA to argue that a change in control took place: He seems to believe that a change in control would occur anytime the Board is made up of three or more directors who were appointed after November 1, 2011, regardless of their approval by the Board:

---

(Id. ¶ 3(b).)

> On November 1, 2011, the "Effective Date" of Mr. Luther's ESA, there were 10 directors sitting on Navistar's Board of Directors. Under Paragraph 3(b), if three or more of the "Effective Date" directors leave the Board for any reason, then the remaining "Effective Date" directors cease to constitute more than three-fourths of the number of directors then-serving on the Board of Directors and a "Change in Control" is deemed to have occurred. Between the November 1, 2011 effective date and Mr. Luther's June 30, 2014 dismissal from Navistar, five directors left Navistar's Board of Directors.

(Pl.'s Mem. at 5-6.)

Plaintiff's reading ignores significant and relevant portions of Paragraph 3(b) of the ESA. Based on the full text of that paragraph and the current record, Luther is not entitled to judgment as a matter of law on his claim for additional severance. The court notes that Navistar has also moved for summary judgment on the entirety of Count 1. Although the record currently appears to establish that no change in control occurred, the court will not rule on Defendant's cross-motion for summary judgment until that motion is fully briefed. Plaintiff has thirty days from the date of this order to file his response; Defendant's reply, if any, will be due thirty days thereafter.

## **CONCLUSION**

The General Release bars Count 2, which is dismissed. Plaintiff's motion for partial summary judgment [54] is denied. Ruling on the remaining issues raised in Defendant's cross-motion for summary judgment [65] is deferred, pending further briefing from the parties as set forth above.

ENTER:

Dated: July 1, 2016

_____
REBECCA R. PALLMEYER
United States District Judge