**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| REGIS LUTHER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 15 C 3120 |
| ) | |
| NAVISTAR, INC., NAVISTAR ) | Judge Rebecca R. Pallmeyer |
| INTERNATIONAL CORPORATION, and ) | |
| NAVISTAR SUPPLEMENTAL EXECUTIVE ) | |
| RETIREMENT PLAN, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Regis Luther worked for Defendant Navistar, Inc. as a Vice President from September 1, 2009 until June 30, 2014. Luther received severance and retirement benefits at the time of his termination, but in this lawsuit, which the parties agree is within the court's jurisdiction pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, Luther contends that he is entitled to substantially enhanced benefits under Navistar's Executive Severance Agreement and Supplemental Executive Retirement Plan. In an earlier ruling, the court concluded that Luther's claim to those additional benefits is not barred by the terms of a release he signed. *See Luther v. Navistar Int'l Corp.,* No. 15 C 3120, 2016 WL 3568809 (N.D. Ill. July 1, 2016) ("*Luther I*"). This opinion assumes familiarity with that earlier one, which lays out the terms of the Plan. As described in more detail there, the Plan provides substantially greater benefits for an executive who was terminated or retired after a change in control of the company. The court's earlier opinion forecast that Luther would have great difficulty establishing that there was a change in control at Navistar within the meaning of Plan provisions or relevant regulations. In this opinion, the court concludes that although the record remains poorly developed, it appears there are disputes of material fact about whether such a change in control occurred.

**BACKGROUND**

Plaintiff Regis Luther is an accomplished engineer and business executive who worked at Navistar, Inc. from September 1, 2009 to June 30, 2014. (Def.'s Local Rule 56.1 Statement of Uncontested Material Facts [hereinafter Def.'s SOF] [66], at ¶¶ 4–5.) Luther was eligible to participate in plans that provide severance pay to Navistar executives in the event of their termination: the Executive Severance Agreement ("ESA") and the Supplemental Executive Retirement Plan ("SERP"). (*See* Def.'s SOF ¶ 6.) As explained in *Luther I*, an executive who is terminated within 36 months of a change in control is entitled to substantially greater benefits.

Under the terms of the ESA, a standard change in control ("CIC") occurs when three of Navistar's board seats change hands with the approval of less than two-thirds of the board members as of a particular date. (Def.'s SOF ¶ 11; ESA ¶ 3). Even if board seats change hands with the approval of the other board members, this may still constitute a change in control if the new members are named "in connection with an actual or threatened election contest, including, but not limited to, a consent solicitation, relating to the election of directors to the Company . . . ." (*Id.*) A CIC also occurs if "any 'person' or 'group' . . . is or becomes the 'beneficial owner,' . . . directly or indirectly, of securities of the Company . . . representing twenty five percent (25%) or more of the combined voting power of the Company's then-outstanding securities . . . ." (ESA ¶ 3(a).) Another type of change in control that can trigger additional benefits is known as a "409A Change in Control" (Def.'s SOF ¶ 16; ESA ¶ 5(b)(iii)), a reference to Internal Revenue Service regulations at 26 CFR 1.409A-3(i)(5)(v)–(vii). (*Id.*) Such a change occurs when "a person or group" acquires a substantial position within the company.[1]

---

[1] A 409A change occurs under any of the following four circumstances: 1) a person or group acquires ownership of 50% of the total fair market value of the stock of the corporation, 26 CFR 1.409A-3(i)(5)(v)(A); 2) a person or group acquires (or has acquired during the 12–month period ending on the date of the most recent acquisition by such person or persons) 30% of the total voting power of the stock, 26 CFR 1.409A-3(i)(5)(vi)(A)(1); 3) a majority of the members of the corporation's board of directors is replaced during a 12-month period, 26 CFR 1.409A-3(i)(5)(vi)(A)(2); or 4) a person or group acquires (or has acquired during the 12–month period ending on the date of the most recent acquisition by such person or

**Luther's Theory of a Change in Control**

Luther contends such a change in control occurred in this case. During the relevant period, Navistar's Board has always had ten or fewer directors. (Am. Compl. ¶ 48; Def.'s Mem. of Law [hereinafter Def.'s Br.] [67-1], at 9.)[2] The parties agree that five directors retired in 2012 and 2013, and five new directors joined the Board in 2013 and 2014. (*See* Am. Compl. ¶¶ 49–52; Def.'s Br. 10–11.) It is also undisputed that the directors confirmed or nominated every one of the five Board appointments in 2013 and 2014 unanimously. (Def.'s SOF ¶ 47.) Therefore, these appointments only constitute a CIC under the relevant provisions if they were made in connection with an actual or threatened election contest. (*See* ESA ¶ 3.)[3] Luther contends that test is met. Specifically, he argues that Carl Icahn and his affiliates, and Mark Rachesky and his affiliates, together constitute a "group" that became the owner of a substantial position in Navistar.

In the summer of 2012, a committee of the Navistar Board was "discussing" board membership seats with Carl Icahn and his affiliates (the "Icahn Group") and with Mark Rachesky and his affiliates (the "MHR Group"). (Def.'s SOF ¶ 21.) Navistar asserts that these were separate discussions and that there was no coordination between the Icahn Group and the MHR Group. (*Id.*) On June 21, 2012, the MHR Group disclosed that it was the beneficial owner of 9,335,837 shares, representing a 13.6% stake of Navistar's total voting shares. (Schedule 13D Statement, Ex. E to Pl.'s Statement of Add'l Facts [98 at p. 33], at 6.) On July 11, 2012, the Icahn Group disclosed that it was the beneficial owner of 9,038,814 shares of Navistar,

---

persons) 40% of the total market value of the assets of the corporation, 26 CFR 1.409A-3(i)(5)(vii).

[2] Defendants deny this statement of fact in their answers, but the record does not otherwise disclose a dispute about this issue.

[3] These seat changes cannot be a 409A Change in Control because five members of a ten-member Board do not constitute a majority. *See* 26 CFR 1.409A-3(i)(5)(vi)(A)(2).

3

representing a 13.19% stake in the voting shares of the company. (Schedule 13D Statement, Ex. F to Pl.'s Statement of Add'l Material Facts [98 at p. 51], at 16.)[4]

There is some evidence that, Luther believes, could support an argument that there was at this time an "actual or threatened election contest." In a June 20, 2012 press release, Navistar expressed concern about "coercive takeover tactics" and announced adoption of a "Shareholder Rights Plan." (Press Release, Navistar Int'l Corp., Navistar Adopts Stockholder Rights Plan (Jun. 20, 2012), Ex. C to Pl.'s Statement of Add'l Facts [98 at p. 30], at 1.) The press release describes the plan as "designed . . . to prevent an acquirer from gaining control of the Company without offering a fair and adequate price to all of the Company's stockholders." (*Id.*) The plan established what Luther refers to as a "poison pill": it provided that if a person or group acquired a 15% stake in the common stock of the company, each current holder of Navistar stock would be entitled to buy from a new series of preferred stock at a set price. (*Id.*; Pl.'s Mem. in Opp. to Def.'s Cross-Mot. for Summ. J. [hereinafter "Pl.'s Resp. Br."] [96], at 5.)

The Navistar Board formed a committee in early July 2012 to continue to discuss board seats with the Icahn and MHR groups. (Def.'s SOF ¶ 21.) Then in early September, Mr. Icahn issued an open letter to Navistar's Board, identifying himself as "one of the largest holders of shares of common stock" and expressing "grave concern about the future of Navistar . . . ." (Letter from Carl Icahn, Ex. G to Pl.'s Statement of Add'l Facts [98 at p. 71], at 1.) The letter criticizes the choice of Lewis Campbell as interim CEO, and the adoption of the "poison pill" which, according to Icahn, "stifle[s] even ordinary course shareholder communication . . . ." (*Id.*) Icahn's letter goes on:

> This is a Board at war with its own shareholders. I urge you to reconsider the path the Board has chosen, which harms our company and puts you at serious risk of personal liability. Instead, I recommend that you permit the voices of shareholders to be heard directly at the Board level by making four Board seats

---

[4] Luther attaches several news articles to provide context to these claims, but the articles are inadmissible hearsay. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (newspaper articles attributing statements to defendants in securities fraud action were inadmissible hearsay).

> available to shareholders immediately—at this critical juncture in the history of Navistar—before any more damage is done to our company by the existing Board.
>
> I would prefer to amicably resolve this matter now, rather than through protracted litigation and a proxy fight. However, I am sure that you have no doubt that I will proceed with both, if necessary, to protect my investment and the interest of all shareholders.

(*Id.*) According to the letter, Icahn intended to deliver a "demand under Section 220 of the Delaware General Corporation Law seeking access to corporate documents and Board proceedings at Navistar." (*Id.*) Navistar's Board responded to the letter in a short press release, in which it noted that it had been negotiating with Mr. Icahn for a year and was disappointed in "his unproductive tactics of threats, attacks and disruption rather than continuing constructive engagement, particularly at this important time for Navistar." (Press Release, Navistar, Inc., Navistar Responds to Letter from Carl Icahn (Sept. 10, 2012), Ex. D-31 to Def.'s SOF [67-9].) Icahn responded with another letter, in which he criticized many previous management decisions and restated his intention to issue a demand under Section 220. (Letter from Carl Icahn, Ex. D-32 to Def.'s SOF [67-9], at DEF5849–50.) Luther does not produce any public statements that the MHR Group made during this time period. (Pl.'s Resp. to Def.'s SOF [97], at ¶ 24.)

The Board entered into separate settlement agreements with the Icahn Group and the MHR Group, both of them effective October 5, 2012. (Def.'s SOF ¶ 25.) Under the terms of those agreements, the Icahn Group and MHR Group each were permitted to appoint a member to the Board, and to jointly appoint one additional director to the Board. (Def.'s SOF ¶ 25.) The appointments were unanimously approved by the Board in connection with the settlement agreements. (*See* Def.'s SOF ¶ 47; *see generally* Joint Mtg. of Board of Directors of Navistar Int'l Corp., Oct. 5, 2012 Minutes, Ex. D-16 to Def.'s SOF ([70 at p. 61].) The MHR Group appointed Mark Rachesky himself to the Board and the Icahn Group appointed Vincent Intrieri,

Senior Managing Director of Icahn Capital LP,[5] both appointments were effective October 8, 2012. (Def.'s SOF ¶¶ 39–40.) Samuel Merksamer, a Managing Director of Icahn Capital LP, was appointed to the Board on December 10, 2012 as the joint designee. (Def.'s SOF ¶ 42.)

Lewis Campbell was replaced by Troy Clarke as Navistar's Chief Executive Officer, and as a director on the Board, on April 15, 2013. (Def.'s SOF ¶¶ 37–38.) Navistar asserts that this change has no connection to the ongoing negotiations with the Icahn Group or the MHR Group. (*Id.*) Luther disputes this, but cites nothing more than the fact that Icahn specifically targeted Campbell in his open letter. (Pl.'s Resp. to Def.'s SOF ¶¶ 37–38.)

The settlement agreements between Navistar and the Icahn and MHR Groups were amended the following summer on July 14, 2013, granting both groups the right to nominate one additional member to the Board—instead of appointing the joint designee—at the annual meeting of stockholders. (Def.'s SOF ¶ 26.) Mr. Merksamer, who had been serving on the Board as the joint designee under the previous iteration of the settlement agreements, was the Icahn Group's nominee pursuant to the amended settlement and was elected. (Def.'s SOF ¶ 43.) The MHR Group nominated Michael Sirignano, a principal at MHR Fund Management, who was nominated and elected effective March 10, 2014. (Def.'s SOF ¶ 44.) Each of these five Board changes replaced other individuals on the Board. Navistar asserts that two of these resignations were unrelated to the negotiations with the Icahn and MHR groups (Def.'s SOF ¶¶ 37, 41). For three others (Steven Klinger, Eugenio Clariond and Diane Gulyas), Navistar does not comment on the reason for the resignation. (Def.'s SOF ¶¶ 32, 33, 35.) The relevant Board meeting minutes show that the resignations of Klinger and Clariond were accepted conditionally upon the execution of the settlement agreements. (Joint Mtg. of Board of Directors

---

[5] Mr. Intrieri's title, and all of the titles of the Board appointees, come from Plaintiff's Statement of Additional Facts, in which they are asserted without citation or support in the record. (*See, e.g.*, Pl.'s Statement of Add'l Facts [98], at ¶ 23 (containing Mr. Intrieri's title).) Navistar is correct that these titles are not properly supported, *see* Local Rule 56.1(b)(3)(C), but it appears the titles are undisputed.

of Navistar Int'l Corp., Oct. 5, 2012 Minutes, at 8–9 (Steven Klinger's resignation "conditioned upon the execution of the Icahn Agreement by the Icahn Group . . . ."); Joint Mtg. of Board of Directors of Navistar Int'l Corp., Oct. 7, 2012 Minutes, Ex. D-17 to Def.'s SOF [70 at p. 76], at 2 (Eugenio Clarond's resignation "conditioned upon the MHR Group executing the MHR Agreement . . . .").) Gulyas's resignation was contemporaneous with Merksamer's appointment to the Board on December 10, 2012. (Joint Mtg. of Board of Directors of Navistar Int'l Corp., Dec. 10, 2012 Minutes, Ex. D-22 to Def.'s SOF [70 at p. 111], at 1–2.)

Also in July 2013, Navistar amended the Stockholder Rights Plan to raise the "poison pill" ownership share trigger from 15% of the outstanding shares to 20%. (Def.'s SOF ¶ 52.) Luther suggests (without specific evidentiary support) that this change was made to allow the Icahn and MHR groups to gain greater control over the company. (*See* Pl.'s Resp. to Def.'s SOF ¶ 52.) The MHR Group and the Icahn Group did continue to increase their respective stakes in Navistar. In July 2013, MHR declared in a Schedule 13D filing that it held 14.933% of the voting shares (Pl.'s Local Rule 56.1 Statement of Add'l Material Facts [hereinafter "Pl.'s SOF"] [98], at ¶ 19), and the Icahn Group declared a 16.55% ownership stake (Def.'s Resp. to Pl.'s SOF [104], at ¶ 20.) By April 2014, the Icahn Group owned 17.64% of the voting shares. (Pl.'s SOF ¶ 24.) On June 24, 2014, the MHR Group filed a Schedule 13D report declaring a 17.2% ownership stake. (Pl.'s SOF ¶ 25; Def.'s Resp. to Pl.'s SOF ¶ 25.) Luther's termination was effective shortly after these declarations on June 30, 2014.

Luther does not dispute that no actual election contest occurred during this tumultuous period at Navistar. (Def.'s SOF ¶ 48.) It is also undisputed that no person or group ever declared to the SEC that it had become a "beneficial owner" of shares that triggered any of the provisions that would constitute a change in control under the terms of the ESA: no person or group ever reported, during the relevant period, ownership of more than 20% of the voting power of Navistar's stock (Def.'s SOF ¶ 53), more than 50% of the total value of all Navistar shares (*id.*), or more than 40% of Navistar's total assets. (Def.'s SOF ¶ 54.)

Instead, Luther argues that the five changes to the Board were the result of a threatened election contest. Navistar insists that "Navistar did not interpret either of Icahn's letters as threatening an election contest." (Def.'s SOF ¶ 23.) Navistar cites a Compensation Committee vote resolving that a "change in control" had not occurred after the Icahn and MHR groups were permitted to name individuals to the Board (Compensation Committee of Navistar Int'l Corp., Oct. 25, 2012 Minutes, Ex. D-21 to Def.'s SOF [70 at p. 107], at 2–3), and a Board vote, confirming that, in the Board's opinion, a change in control had not occurred. (Joint Mtg. of Board of Directors of Navistar Int'l Corp., March 5, 2013 Minutes, Ex. D-24 to Def.'s SOF [70 at p. 135], at 6.)

Luther further argues that the Icahn Group and the MHR Group were acting as a single group within the meaning of the ESA, meaning that Icahn's and MHR's activities effectuated both a standard change in control and a 409A change in control. Added together, the Icahn and MHR groups controlled 34.84% of the voting power of Navistar's stock as of June 23, 2014. (Pl.'s SOF ¶ 26.) If Luther these investors were acting as a group, they would together own more than 30% of the voting shares, and there would be a change in control under the terms of the ESA¶ 3 and 409A. 26 C.F.R. 1.409A-3(i)(5)(vi)(A)(1). This theory is not spelled out in Luther's Amended Complaint; he has alleged no facts regarding the "voting power" theory of a change in control or 409A change in control under the terms of the ESA, and instead focuses solely on the changeover in Board seats. The complaint does contain the legal conclusion that Luther is entitled to more years of age and service credit under the SERP, however, which hinges on a 409A change in control having occurred. (ESA ¶ 5(b)(iii).)

## DISCUSSION

On a motion for summary judgment, the court examines the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate where that

8

review discloses no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Though the record is reviewed favorably to the non-movant, "the non-moving party is required to marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

I.   **Preliminary Issues**

Navistar raises two threshold arguments: first, that Luther should be deemed to have admitted every allegation by Navistar in its Local Rule 56.1 submissions to which Luther provided an inadequate response, and second, that Luther is effectively seeking to amend his complaint in his response to summary judgment, which the court should not entertain. Luther submitted several answers in his Local Rule 56.1(b)(3) response that fail to include "specific references to the affidavits, or parts of the record, and other supporting materials relied upon" required in the event that the non-movant has "any disagreement" with the statements put forth by the movant. N.D. ILL. LOCAL R. 56.1(b)(3)(B). For example, Luther responded to several of Navistar's statements of fact with the simple words "Disputed" or "Disputed and unknown." (Pl.'s Resp. to Def.'s SOF ¶¶ 18, 21, 22, 51, 55, 71, 72, 73). In some instances, Navistar's statements are plainly disputed because they set forth legal conclusions that go to the heart of Luther's case, i.e., "Given Plaintiff's September 1, 2009 hire date and his January 26, 1960 birthday, Plaintiff was not eligible to receive SERP benefits . . . ." (Def.'s SOF ¶ 18); "At no point between November 1, 2011 and June 30, 2014 were any directors appointed to the Board in connection with an actual or threatened election contest . . . ." (Def.'s SOF ¶ 51; *see also* Def.'s SOF ¶ 55.) Navistar is not prejudiced by Luther's abbreviated notation of his dispute to these applications of law to fact, as the basis of this dispute is apparent in the other statements of fact and in the brief. Other of Luther's responses "dispute" allegations related to the General Release which fall into the same category (Def.'s SOF ¶¶ 71–73), or which are not relevant to

9

the current dispute because the court has already resolved them. *Luther I*, 2016 WL 3568809 at *5–6.

The final category of responses involves those in which Luther asserts that they are both "Disputed and unknown." (Pl.'s Resp. to Def.'s SOF ¶¶ 21–22.) Luther's position on these statements is puzzling, as they concern the Board's ongoing discussions with the Icahn and MHR groups beginning in the summer of 2012. (Def.'s SOF ¶¶ 21–22.) Those statements appear to be the best support for Luther's case, as described below, and are deemed admitted.

Navistar contends that Luther is attempting to amend his complaint at the summary judgment stage. Indeed, the complaint does not articulate Luther's factual theory that a CIC occurred because a group acquired a stake exceeding 25% of the voting shares, or that a 409A change occurred because a group acquired a stake exceeding 30%; instead, the complaint only states allegations related to the change in Board seats. (*See* Am. Compl.) Courts "should freely give leave [to amend] when justice so requires," however. FED. R. CIV. P. 15(a)(2). This court has "broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008). Because Navistar has responded, at least to some degree, to Luther's new theory in its reply brief, the court will entertain it here.

II. **There is a genuine issue of material fact as to whether three or more Board members were replaced in connection with a "threatened election contest."**

Luther argues that a total of five members of the Board were replaced pursuant to a threatened election contest, orchestrated by the Icahn and MHR groups, which exceeds the three seats necessary to trigger a CIC under the ESA. In interpreting an ERISA-governed severance plan like the ESA, courts "shall construe the plan in accordance with the federal common law under ERISA and shall apply general rules of contract interpretation." *Bowles v. Quantum Chem. Co.*, 266 F.3d 622, 633 (7th Cir. 2001). "[F]ederal courts 'must interpret the

express terms of a plan in an ordinary and popular sense as would a person of average intelligence and experience . . . ." *Id.* (quoting *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 419 (7th Cir. 1998)) (internal quotation marks omitted). Neither party has offered any specific interpretation of the expression at issue here: appointment of a board member "in connection with an actual or threatened election contest, including, but not limited to, a consent solicitation, relating to the election of directors to the Company." (ESA ¶ 3). The phrase "including, but not limited to, a consent solicitation" implies that other procedural mechanisms could qualify as a threatened election contest. As the court understands the reference to an "actual or threatened election contest," it appears to encompass a threat to nominate a new board member for election or to support a new board member in an election.

The three-member replacement requirement could have been met in one of two ways. First, the Icahn Group alone negotiated for and received two seats on the Board, and there is a dispute as to whether a third Board member, Lewis Campbell, was replaced in response to to Icahn's influence. Carl Icahn singled Campbell out for criticism in his open letter, in which Icahn threatened a "proxy fight." (Letter from Carl Icahn at 1.) A reasonable jury could understand the letter as a threat to muster votes to oust current Board members. Navistar emphasizes Mr. Icahn's statement in his open letter that he "would prefer to amicably resolve this matter now, rather than through protracted litigation and a proxy fight," and contends that language demonstrates he did not intend to threaten an election contest. But that interpretation appears to ignore the rest of Icahn's sentence, in which he promises to "proceed with both, if necessary, to protect [his] investment and the interest of all shareholders." (*Id.*) Navistar has not foreclosed all material disputes of fact as to whether at least three of the Board members were replaced after a threatened election contest. The fact that Luther's contention of a threatened election contest rests on evidence that Navistar itself furnished (Def.'s Reply Br. in Supp. of Summ. J [hereinafter "Def.'s Reply Br."] [103], at 6–7), does not alter this conclusion.

11

Nor does the fact that, as Navistar points out, Luther did not dispute the following statement of fact in Navistar's Rule 56.1 submission:

> At no point between November 1, 2011 and June 30, 2014 did any individual (or group) referring to himself in an SEC filing as a "beneficial owner" (as defined in Sections 13(d)and 14(d) of the Securities Exchange Act of 1934 (see 17 C.F.R. § 240.13d-3)) of Navistar stock ever threaten (within the meaning of Paragraph 3(b) of the ESA) to engage in an actual election contest, a proxy contest, consent solicitation, or any similar corporate governing event as to the directors on the Board.

(Def.'s SOF ¶ 50) (citations omitted). By admitting this statement, Luther has conceded that the purported Icahn-MHR group did not declare itself a beneficial owner of Navistar stock (*see* Pl.'s Resp. to Def.'s SOF ¶ 53). That admission does not foreclose the argument that such a group did exist and threatened an election contest. (*See* Pl.'s Resp. to Def's SOF ¶¶ 51, 55.) To the extent that Luther, in interpreting the statement this way, failed to dispute Navistar's position that neither the Icahn Group nor the MHR Group *separately* threatened an election contest, that admission is contradicted by Luther's other responses. Particularly, Luther disputed Navistar's allegation that Navistar's Board did not interpret Icahn's letter as threatening an election contest. (*See* Pl.'s Resp. to Def.'s SOF ¶ 23 ("Disputed. . . . It strains common sense to believe that Navistar did not interpret Carl Icahn's actions in September, 2012 as the start of a hostile takeover at Navistar.").) Interpreting Luther's answer to Paragraph 50 to scuttle a factual theory of the case that he clearly intended to maintain does not serve the purposes of Local Rule 56.1, which is to clarify the parties' positions for summary judgment, *see Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994), not to set the parties up for "gotcha" dismissals of their cases.

Second, Luther argues that the MHR and Icahn groups coordinated their efforts to replace board members. Navistar does not dispute that both the Icahn Group and MHR Group sought seats on Navistar's Board in negotiations beginning in the summer of 2012, and that those negotiations resulted in each group seating two individuals to the Board. There is some evidence that the two groups were acting as a single group within the meaning of the ESA,

12

discussed further below. Though Icahn and MHR may not have engaged in joint purchases of stock, it appears that they did either engage in joint negotiations or at least reach a coordinated resolution, one that placed in their hands the responsibility to identify one Board member jointly. The court is not prepared to grant summary judgment on this theory, either.

III.  **There is a genuine issue of fact concerning whether the Icahn and MHR investors constitute a group.**

As sketched out above, Luther's theory is that the Icahn and MHR groups were acting as a single group within the meaning of the ESA's provisions. If he prevails on this theory, he can establish a change of control because together the two purchasing entities acquired 34.84% of Navistar's voting stock, well in excess of the 25% threshold required for a standard change in control as well as the 30% threshold for a 409A. Disappointingly, despite ample opportunity for discovery, Luther appears not to have obtained basic information necessary to establish such a theory. The court is nevertheless unwilling to dismiss his case at this stage, because at least some case law supports it, even on the current record.

A CIC occurs if a "group" acquires greater than 25% of Navistar's voting stock, as "group" is defined in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934. (ESA ¶ 3.) Sections 13(d) and 14(d) were added by the Williams Act of 1968, Pub L. No. 90-439, 82 Stat. 454 (codified at 15 U.S.C. § 78m(d); 15 U.S.C. § 78n(d)), which created disclosure requirements for any person or group that was the beneficial owner of more than 10% of any class of security issued by a company. Those sections define group as the following: "When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for purposes of this subsection." 15 U.S.C. § 78m(d)(3); 15 U.S.C. § 78n(d)(2).

This definition was examined at length in *Bath Industries, Inc. v. Blot*, 427 F.2d 97 (7th Cir. 1970). There, the plaintiff, the company itself, alleged that a number of shareholders had

acted as a "group" but failed to disclose their stake as required under the Williams Act. *Id.* at 101. The company sought a preliminary injunction to prevent them from executing their plan to remove the CEO. *Id.* The district court concluded that the shareholders had acted as a group and granted the injunction. *Id.* The Seventh Circuit, interpreting the Williams Act, held that stockholders act as a "group" when "any group of stockholders owning more than 10% [of] the outstanding shares of the corporation agree to act in concert to acquire additional shares." *Id.* at 109. The court recognized that "proof of such an agreement to acquire would be difficult for anyone not privy to the group's plan[,]" and therefore concluded that "once it is shown that such a group has agreed to pursue a common objective, and once it is further shown that a member of the group has thereafter purchased additional shares of the corporation's stock, then a rebuttable presumption arises that such purchase was made pursuant to an agreement of the group as of that date to acquire shares in furtherance of its objectives." *Id.* at 110.

Turning to the facts before it, the court found sufficient evidence that several of the defendant shareholders had a common objective: to remove the current CEO of the plaintiff company. *Id.* at 111. The ringleader, Blot, had engaged in several discussions with other investors in which he stated his desire to remove the CEO, and attempted to convince the other investors to buy the CEO's shares to further that objective. *Id.* Blot actually identified a replacement CEO, and communicated his plan to appoint the replacement to several other of the defendant shareholders. *Id.* Furthermore, several of the shareholders purchased additional stock after this agreement took place. *Id.*

The Seventh Circuit concluded these findings were sufficient to support entry of a preliminary injunction. The court recognized, however, that proof of a common objective would need to be developed with more certainty after the parties had the "opportunity to develop the facts before the district court." *Id.* The court also observed that "[w]hile there is little or no direct evidence of [an agreement to purchase] in the instance case," there was evidence that the shareholders continued to purchase stock after "combining in opposition" to the CEO and the

14

rebuttable presumption attached; sufficient, the court found, to survive review of a preliminary injunction. *Id.*

"Group" is defined slightly differently for purposes of a 409A change in control. The underlying IRS regulation adds additional guidance to the meaning of the word "group" under that section:

> Persons acting as a group. For purposes of paragraph (i)(5)(v)(A) of this section, persons will not be considered to be acting as a group solely because they purchase or own stock of the same corporation at the same time, or as a result of the same public offering. However, persons will be considered to be acting as a group if they are owners of a corporation that enters into a merger, consolidation, purchase or acquisition of stock, or similar business transaction with the corporation . . . .

26 C.F.R. 1.409A-3(i)(5)(v)(B). Navistar argues that this section limits the definition of group to the second sentence: persons who are "owners of a corporation that enters into a merger, consolidation, purchase or acquisition of stock . . . ." (Def.'s Reply Br. 11–12.) But the language of the statute does not support that interpretation. First, the use of the word "group" implies a much broader variety of relationships than two or more persons that own a corporation together; there would be no reason to use "group" if the rule was meant only to capture this very narrow rule, and it would be in clear conflict with the broad definition of group in the Williams Act which covers very similar subject matter. *See Marlowe v. Bottarelli*, 938 F.2d 807, 813 (7th Cir. 1991) ("[W]henever possible courts construe statutes and regulations in *pari materia*."); *see also United States v. Sanders*, 708 F.3d 976, 993 (7th Cir. 2013) (statutes using same term should not be read in conflict with one another). The IRS may have intended a different definition than the one contained in the Williams Act, but there is no clear indication of such an intention. In this court's view, it is reasonable to conclude that the second sentence of the regulation, beginning with the word "however," is intended to set forth an example—not necessarily an exclusive definition. *NationsBank of N.C. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256–58 (1995) (delineation of specific powers under National Banking Act do not capture entire grant of power; list is "exemplary, not exclusive.") "Group," as defined in 409A, is only narrower than

15

the definition in the Williams Act to the extent specifically defined in 26 CFR 1.409A-3(i)(5)(v)(B).

Navistar argues that Luther's theory of the case relies on a finding that the Icahn Group and the MHR Group failed to disclose their status as a single group, in violation of their obligations under 17 C.F.R. § 240.13d-101. This argument is better suited for trial, as it does weigh on the believability of Luther's allegations, but it does not preclude Luther from presenting the characterization of the facts he proposes here. The court draws no conclusions at this stage about whether the investors were required to disclose their status under this rule.

Finally, the court recognizes that Luther has identified little evidence that demonstrates that Icahn and MHR coordinated to achieve any *common* goal. The investors may have had no goal other than to secure seats for each investor. Without a common objective, the groups' later purchase of stock cannot substantiate that they were acquiring stock as a single group under *Bath*. 427 F.3d at 110 ("[O]nce it is shown that such a group has agreed to pursue a common objective . . . then a rebuttable presumption arises that such purchase was made pursuant to an agreement . . . ."). At this stage, the only evidence that the two groups' efforts were coordinated is the fact that they reached settlement agreements with Navistar at the same moment, and the agreement permitted them to appoint one designee to the Board jointly. (Pl.'s SOF ¶¶ 11–13.) In *Bath*, in contrast, the plaintiff produced evidence of discussions between the defendant shareholders to remove the CEO and an attempt to purchase the CEO's shares. 427 F.2d at 111. As noted, Luther has been free to engage in discovery and yet, so far as the court is aware, has not even obtained deposition testimony from representatives of either group (or any communications between them), from Navistar, or from the Board members who were appointed or replaced. At the very least, he has not produced any to the court in his statements of fact or his responses.

In his responses to Navistar's statements of fact, Luther repeatedly responds to Navistar's assertions regarding the discussions between the Icahn and MHR groups and

Navistar's Board that he does not know whether the fact is true, and to know would require "further discovery." (Pl.'s SOF ¶ 21, 22, 24.) He nevertheless has not formally invoked the procedures contemplated in FED. R. CIV. P. 56(h). Instead, in response to other statements of fact, he appeals to common sense to create a dispute of fact. For example:

> **Statement**: "Lewis Campbell . . . . was not appointed to the Board, nor did he retire from the Board, in connection with either the Icahn Settlement Agreement or the MHR Settlement Agreement."

(Def.'s SOF ¶ 37.)

> **Response**: "Disputed. . . . It strains common sense to believe that the timing of Mr. Campbell's service with Navistar and the increasing acquisition of control of Navistar by the Icahn Group and the MHR Group were simply coincidence."

(Pl.'s Resp. to Def.'s SOF ¶ 37.)

> **Statement:** "In June 2012, the Board adopted a Stockholder Rights Plan with a 15% [Navistar] stock ownership threshold, which was increased to 20% in July 2013 . . . ."

(Def.'s SOF ¶ 52.)

> **Response:** "Undisputed. Plaintiff believes that the Board changed the ownership threshold to permit the Icahn Group and the MHR Group to purchase additional Navistar stock without triggering Navistar's "poison pill" provision thereby allowing the Icahn Group and the MHR Group greater control over Navistar."

(Pl.'s Resp. to Def.'s ¶ 52.)

The court reminds Luther that it is his burden to prove the existence of an agreement, and that common sense and the existence of a joint designee to the Board may be insufficient to meet that burden. For now, the court concludes that the evidence does not eliminate all factual disputes on this issue. To the extent Luther now needs further discovery, the court expects him to explain this by way of a motion and proceed promptly.

## **CONCLUSION**

In its earlier opinion, the court invited Luther to present further argument as to whether the release he signed bars the ERISA interference claim he asserted in Count II of his Amended Complaint. Luther has not done so. Navistar's motion for summary judgment [65] is granted

with respect to Count II and otherwise denied without prejudice. Luther is directed to file an amended complaint to set forth the factual theories he asserts here within 14 days and to move for leave to proceed further with necessary discovery within 14 days, as well. Status conference is set for April 20, 2017, at 9:00 a.m.

ENTER:

Date: March 31, 2017

_____
REBECCA R. PALLMEYER
United States District Judge