**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **REGIS LUTHER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )   No.  15 C 3120 |
| | ) |
| **NAVISTAR INTERNATIONAL** | )   Judge Rebecca R. Pallmeyer |
| **CORPORATION, NAVISTAR, INC.,** | ) |
| **and NAVISTAR SUPPLEMENTAL** | ) |
| **EXECUTIVE RETIREMENT PLAN,** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION AND ORDER

Regis Luther's claim for enhanced severance and retirement benefits from his former employer, Defendant Navistar, Inc., has generated multiple rounds of briefs and two significant rulings. Luther's position as a Navistar Vice President ended in 2014. He filed this lawsuit early the next year, alleging breach of his compensation agreements. Navistar removed the case to this court as preempted by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and moved for summary judgment on the basis of a release Luther had signed. The court rejected that argument, *see Luther v. Navistar Int'l Corp.*, No. 15 C 3120, 2016 WL 3568809 (N.D. Ill. July 1, 2016) ("*Luther I*"), but suggested Luther's claim for enhanced severance benefits would be difficult to establish. Navistar then moved for summary judgment on the merits of Luther's claims, but the court denied that motion as well, finding disputes of material fact under a theory that Luther had raised only in his response brief. *Luther v. Navistar Int'l Corp.,* No. 15 C 3120, 2017 WL 1197103 (N.D. Ill. Mar. 31, 2017) ("*Luther II*"). The court granted Luther leave to file an amended complaint (his third amendment since initiating this lawsuit) to assert this new theory, and he has done so. Navistar has filed a motion for partial dismissal of this case and for partial reconsideration of the court's denial of Navistar's motion for summary judgment. As explained here, the court concludes that the evidence does not support

Luther's claim that a "409A change in control" (described below) occurred prior to his termination. The motion for partial reconsideration [111] is therefore granted.

## BACKGROUND

The court has discussed the facts of the case in detail in its two previous opinions and summarizes those facts briefly here. Luther was terminated on June 30, 2014. (Third Amended Complaint (labeled as Second Amended Complaint) (hereafter "Compl.") [107], at ¶ 27.) At the time of his firing, Luther had two agreements with Navistar that provided benefits to him upon severance: the Executive Severance Agreement ("ESA") and the Supplemental Executive Retirement Plan ("SERP"). (*Id.* ¶ 14.) It is somewhat unclear whether these are two agreements or whether, as Luther alleges, the "ESA is Mr. Luther's Supplemental Executive Retirement Plan." (*Id.* ¶ 15; compare Answer to Plaintiff's Third Amended Complaint [110] ¶ 1.)[1] Either way, there were three potential outcomes for Luther upon his separation from the company: A termination not associated with any change in control of the company entitled Luther to 150% of his salary, plus his "annual incentive target," which appears to be an annual performance bonus. (*Id.* ¶ 5(a).) If Navistar terminated Luther within 36 months after a change in control of the corporation (referred to as a "standard CIC"),[2] then, pursuant to

---

[1] The ESA can be found as an exhibit to Defendant's Statement of Material Facts in Support of its earlier Motion for Summary Judgment ([67-4] at page 72 (Ex. B-13 to Navistar's Cross-Motion for Summary Judgment.)) Luther likely intended to attach the ESA to his amended complaint, as he cited it as Exhibit A in that document. ([107] ¶ 14.) Navistar noticed this omission but did not move to have the complaint dismissed on these grounds, instead citing to a few other locations in the record where the ESA has been produced and encouraging the court to consider those copies as incorporated into the complaint. (*See* Navistar Br. in Supp. of Mot. [112-1], at 3 n.5.)

[2] A standard CIC occurred if either of the following conditions occurred within 36 months of Luther's termination:

1. At least three Navistar board members were replaced "in connection with an actual or threatened election contest . . . ." (ESA ¶ 3(b).)
2. "[A]ny 'person' or 'group' . . . is or becomes the 'beneficial owner'. . . directly or indirectly, of securities of the Company . . . representing twenty five percent (25%) or more of the combined voting power of the Company's then-outstanding securities. . . ." (ESA ¶ 3(a).)

Paragraph 3 of the ESA, he received 200% of his salary, in addition to the annual incentive target. (*Id.* at ¶ 5(b).) And if the change in control met certain requirements set forth in regulations interpreting Internal Revenue Code § 409A, the package became sweeter still: Under paragraph 5(b)(iii) of the ESA, a 409A change-in-control termination would also accelerate Luther's eligibility for certain additional retirement benefits under Navistar's Supplemental Executive Retirement Plan ("SERP"). The nature of these enhanced benefits has been explained elsewhere, but the details and amounts at stake are not important for purposes of this decision. Navistar has not contested Luther's claim for standard retirement benefits, and does not, in this motion, challenge Luther's claim that his termination occurred within 36 months of a "standard CIC." On this motion, Navistar argues only that the court erred in denying summary judgment on Luther's 409A theory. (*See* Navistar Br. in Supp. of Mot. (hereafter "Def.'s Br.") [112-1], at 1.)

Paragraph 5(b)(iii) of the ESA defines a "409A change in control" as "a change in ownership or effective control of the Company or a change in ownership of a substantial portion of the assets of the Company under Section 409A of the Code." IRS regulations at 26 CFR 1.409A-3(i)(5)(v)–(vii) set out several conditions for a "change in control" of a company which differs from those of a "standard CIC." As relevant to this case, if "a person or group acquires (or has acquired during the 12–month period ending on the date of the most recent acquisition by such person or persons) 30% of the total voting power of the stock," 26 CFR 1.409A-3(i)(5)(vi)(A)(1), within 24 months of Luther's termination, then a 409A change in control has occurred and Luther is entitled to additional benefits from Navistar.[3] The question before the court is whether there are disputes of fact about whether a 409A change in control in fact occurred. More specifically, to prevail on this motion, Luther must present evidence that on

---

[3] 409A changes in control can be triggered by a number of other conditions, identified at *Luther v. Navistar Int'l Corp.*, No. 15 C 3120, 2017 WL 1197103, *1 n.1 (N.D. Ill. Mar. 31, 2017), but none plausibly occurred here.

some date within the 24 months prior to his June 30, 2014 termination, there was a date on which a shareholder, or a group of shareholders, had acquired 30% of Navistar's stock within the 12 months prior to that date. The operative complaint does not allege that such an acquisition occurred, Navistar asserts, meaning that its motion to dismiss this claim should be granted. Alternatively, as the evidence does not support the conclusion that such an acquisition took place, Navistar believes it is entitled to summary judgment on Luther's 409A claim.

Luther contends there is evidence sufficient to support his claims that a 409A change in control did occur. He cites stock purchases made by Carl Icahn beginning in 2011 and Mark Rachesky (or his affiliate, MHR Group) in 2012. (Compl., ¶¶ 36, 40.) The Icahn and MHR investors disclosed ownership stakes on July 14, 2013 and July 19, 2013 which together exceeded 25% of total outstanding Navistar stock. (*Id.* at ¶¶ 73, 75–78.) Icahn and MHR continued to purchase stock and purchased an amount totaling nearly 35% by June 23, 2014. (*Id.* at ¶¶ 81–83.) He urges, further, that evidence supports the conclusion that Icahn and MHR were acting as a "group."

In its earlier opinion, *Luther II*, the court concluded that there are genuine disputes of fact about whether a standard CIC as well as a 409A change in control occurred. *Luther II*, 2017 WL 1197103, *6-9. As noted, Navistar does not challenge the court's determinations regarding a standard CIC. Navistar does, however, contend that the court erred in its 409A analysis. First, Navistar urges that the language of the 409A regulation requires that any investor group have acquired 30% of the stock within a single 12-month period, which Luther has not established. Second, Navistar contends that the court erred in defining "group" in the way that it did: the word "group" in the 409A regulations, Navistar contends, is different than the way that it is used in the Williams Act, Pub L. No. 90-439, 82 Stat. 454 (codified at 15 U.S.C. § 78m(d); 15 U.S.C. § 78n(d)), which the court addressed earlier. Luther concedes that for purposes of a 409A change in control, a group must have acquired its shares within a 12-month period. That test is in fact met in this case, he insists because (1) Icahn and MHR acquired 29.92% of the

4

shares within a 12-month period, which, because of the time that those acquisitions were reported, may have exceeded 30%, and (2) that the court should round up the 29.92% figure to 30%. (Pl.'s Resp. Br. [127] at 8–10.)

For reasons explained here, the court is not inclined to reconsider its ruling on the definition of a "group" for purposes of 409A. Navistar prevails on the 30%-over-12-months issue, however, so the court need not reach the definition question.

## **DISCUSSION**

**Purchase of 30% over 12 Months**

Because the 30%-over-12-months argument is dispositive, the court addresses that issue first. Luther has alleged that the Icahn–MHR group together acquired assets culminating in 34.84% of the total voting power of Navistar's stock on June 23, 2014, over the course of about two years. As Navistar emphasizes, however, a Section 409A change in control occurs on "[t]he date any one person, or more than one person acting as a group (as determined under paragraph (i)(5)(v)(B) of this section), acquires (**or has acquired during the 12–month period ending on the date of the most recent acquisition by such person or persons**) ownership of stock of the corporation possessing 30 percent or more of the total voting power of the stock of such corporation." 26 U.S.C. § 1.409A–3(i)(5)(vi)(A)(1) (emphasis added). That means, Navistar notes, that to trigger a 409A change in control, a group must acquire 30% of a company's shares within a 12-month period, not simply exceed the 30% ownership cap. As noted, Luther has not specifically challenged this assertion.

The court concludes that Navistar's interpretation of the regulatory language is correct. As noted, several conditions are identified in the regulations as triggering a change in control; only the 30% test is relevant to this case. But of the other conditions listed, only one of them does not include a time limit over which acquisition must occur: in particular, the regulation recognizes that a change in control has occurred when an entity has achieved 50% stock ownership, without regard to the time period over which that achievement happens. 26 CFR

5

1.409A-3(i)(5)(v)(A).  If the 30% ownership threshold at issue in this case also has no time limit, the 50% test becomes irrelevant.  The court declines to adopt an interpretation that renders one regulatory provision superfluous.

In addition, an example from a different IRS regulation—not at issue here—that also deals with changes in control resulting from stock acquisition over time supports Navistar's position that the acquisition must occur over a 12-month period of time.  That other regulation, 26 C.F.R. § 1.280G-1, uses identical language to limit the period over which a person or group can acquire stock:

> Any one person, or more than one person acting as a group (as determined under paragraph (e) of this A–28), acquires (**or has acquired during the 12–month period ending on the date of the most recent acquisition by such person or persons**) ownership of stock of the corporation possessing 20 percent or more of the total voting power of the stock of such corporation.

26 C.F.R. § 1.280G-1 (A-28(a)(1)).  The regulation goes on to offer an example of a shareholder acquiring stock over a period of time, but whose purchases nevertheless are not deemed to have resulted in a change in control:

> **Example 1.** Shareholder A acquired the following percentages of the voting stock of Corporation M (an otherwise unrelated corporation) on the following dates: 16 percent on January 1, 2005; 10 percent on January 10, 2006; 8 percent on February 10, 2006; 11 percent on March 1, 2007; and 8 percent on March 10, 2007. Thus, on March 10, 2007, A owns a total of 53 percent of M's voting stock. Because A did not acquire 20 percent or more of M's voting stock during any 12–month period, there is no presumption of a change in effective control pursuant to paragraph (a)(1) of this A–28.

*Id.*  Though Shareholder A in that example acquires 53% of the total stock, the shareholder never acquires 20% during a 12-month period and does not trigger a change in control under this different provision.  The court concludes that in order for a 409A change in control to occur, a group or entity must acquire 30% of the corporation's stock over a 12-month period.

That did not occur in this case.  In support of its request for summary judgment, Navistar has assembled a chart summarizing stock acquisitions made by the Icahn Group and the MHG Group over a nearly three-year period, from August 23, 2011 through June 30, 2014.  (Def.'s

Reply Br., Exhibit 22 [128-3].) As the records reflect, the highest percentage of Navistar stock that the MHR Group acquired within any 12-month period between June 2012 and June 2014 is 14.98%. The highest percentage of Navistar stock that the Icahn Group acquired during any 12-month period at that time was 14.94%. As recounted earlier, see Luther II, 2017 WL 1197103, * 8, Navistar contests Luther's argument that MHR and Icahn can fairly be deemed a "group" for purposes of 409A. Even if they are a group, however, Navistar notes, the combined percentage shares that the group purchased in a 12-month period did not exceed 30%. The total outstanding voting shares they purchased was 29.92%--just under the threshold.

Luther notes that the timing of Icahn and MHR's SEC disclosures does not line up perfectly with the Navistar's quarterly reporting of its outstanding shares, leaving open the possibility that the joint stake in the company eked above the 30% line at some point. (Pl.'s Resp. Br. 9.) Navistar points out, however, that the relevant percentages are calculated by dividing shares purchased by total number of outstanding shares at the beginning of the relevant quarter. Because the total number of Navistar's outstanding shares (the denominator in the equation) always increased during the time that Icahn and MHR were acquiring shares, the calculations of Icahn's and MHR's percentage purchases used, if anything, smaller-than-accurate denominators, thus artificially increasing their percentage holdings. (Def.'s Br. 5–6.)

Finally, Luther contends that the 409A regulations imply that the stock ownership percentage should be rounded to the nearest whole number, but he offers no authority for this argument other than the fact that the regulation uses the term "30%" rather than "30.00%." For several reasons, the court rejects this argument. First, as Navistar notes, Congress "knows how to specify rounding" when that is appropriate. See 26 U.S.C. § 41(c)(3)(D) ("The percentages [of research expenses for purposes of a tax credit] shall be rounded to the nearest 1/100th of 1 percent."); 26 U.S.C. § 45R(d)(2) (for purposes of health insurance tax credit, number of full-time equivalent employees "shall be rounded to the next lowest whole number"); 26 U.S.C. §

143(m)(4)(E)(ii) (calculation of income percentage on mortgage bonds for tax purposes "shall be rounded to the nearest whole percentage point").

Second, though there is no direct authority, some case law suggests the percentage test is a bright-line standard. In *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418 (1972), the Court interpreted a provision of the Securities Exchange Act that authorizes a corporation to recover profits realized by an owner of more than 10% of its shares from a purchase and sale of stock within any six-month period. 15 U.S.C. § 78p(b). Reversing lower court decisions, the Court held that, by disposing of shares to reduce its ownership interest to 9.96% before selling them completely, the petitioner successfully avoided such a penalty. *Reliance Electric,* 404 U.S. at 119-20. Finally, the court notes that Luther's argument, if adopted, would require an owner of 29.51% of the shares to be rounded to 30%--potentially hundreds if not thousands of shares in a large corporation. This court concludes, in the absence of authority to the contrary, that in this case, too, a "miss is as good as a mile." In other words, 29.92% is not 30%. There was no 409A change in control.

**The meaning of "group" in Section 409A**

Navistar has also re-asserted its argument that Icahn and MHR do not constitute a "group" for purposes of Section 409A. Because there was no 30% purchase, the court need not reach the issue, but nevertheless comments on it briefly. Navistar believes that 409A defines "group" to mean *only* people that are owners of a corporation that enters into a transaction with the subject corporation. The court erred, Navistar urges, in considering the definition of "group" that appears in the Williams Act. (Def.'s Br., at 16–17.) As Navistar emphasizes, 409A was passed in response to the Enron scandal; its goal was to eliminate discretion from plan administrators when determining whether deferred compensation plan conditions were triggered. The Williams Act, in contrast, was aimed at notifying shareholders about who they were dealing with when a takeover attempt was launched.

The court acknowledges that 409A and the Williams Act have two different purposes, but

8

stands by the analysis in its earlier opinion. The fact that the two statutes have different purposes does not dictate the use of different definitions for the term "group." The post-Enron goal of creating a straightforward test was achieved by making clear that once the stock ownership threshold is exceeded, a change of control has occurred. In this court's view, it is unlikely that § 409A uses the same word as appears in the Williams Act, to refer to the same concept (a change in control of a corporation by a group), but defines it quite differently.

**Luther's new theories**

Finally, the court notes that Luther seeks yet again to amend his theory. This time, he seeks to file an amended complaint (his fourth since initiation of this case in state court) to allege that the *four* largest shareholders of Navistar acted as a group to take over the company. (Pl.'s Resp. Br. 7–8 (proposed amended complaint is attached to the brief as an exhibit).) Navistar objects on the basis of undue delay. *See Naperville Smart Meter Awareness v. City of Naperville*, 114 F. Supp.3d 606, 610 (N.D. Ill. 2015). The objection is sustained. As noted, Luther has already taken advantage of several opportunities to re-plead. Navistar asserts that in more than two years of litigation, "not once has Plaintiff ever referenced any Navistar shareholders other than the Icahn Group and MHR Group, let alone [another 409A change-in-control theory]." (Def.'s Reply Br. [128] at 9-10.) Notably, in support of his request for leave to amend, Luther himself cites disclosures made by Navistar in a January 2013 notice to shareholders and by Icahn in September 2012. This information was thus available to Luther well before he filed his original complaint in this case. Yet even now, his proposed allegations that the four large shareholders acted in concert are conclusory, meaning that any effort to develop this theory would necessitate additional discovery. *See Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 855 (7th Cir. 2017) (affirming denial of motion to amend complaint where, among other reasons, defendants would have had to engage in substantial additional discovery). Luther's request for leave to amend is denied.

## **CONCLUSION**

Defendant's motion to dismiss or for partial reconsideration [111] is granted.

ENTER:

Dated: March 19, 2018

_____
REBECCA R. PALLMEYER
United States District Judge