**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DONALD SHARP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15-cv-00413 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| NAVISTAR INTERNATIONAL | ) | |
| CORP., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| REGIS LUTHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15-cv-03120 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| NAVISTAR INTERNATIONAL | ) | |
| CORP., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiffs Donald Sharp and Regis Luther are former employees of Defendant Navistar,

Inc., a subsidiary of Defendant Navistar International Corp. (collectively, "Navistar"), where each

held an executive position. As executives, Plaintiffs participated in Navistar's Executive

Severance Agreement ("ESA") plan, which governed the terms of an executive's separation from

the company. Among other things, the ESA granted executives increased severance payments if

they were terminated within 36 months of a change in control at Navistar. Both Plaintiffs received

standard severance benefits following their terminations from Navistar but claim they were

entitled to the greater change-in-control benefits. Therefore, each Plaintiff has sued Navistar

seeking those greater benefits pursuant to the Employment Retirement Income Security Act of

1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). *Sharp v. Navistar Int'l Corp.*, No. 15-cv-00413 (N.D. Ill. Jan. 15, 2015); *Luther v. Navistar Int'l Corp.*, No. 15-cv-03120 (N.D. Ill. Apr. 9, 2015). Now before the Court are Navistar's motions for summary judgment in both cases (*Sharp*, Dkt. No. 138; *Luther*, Dkt. No. 194), and Plaintiffs' respective motions for partial summary judgment (*Sharp*, Dkt. No. 136; *Luther*, Dkt. No. 192). In addition, Plaintiffs have filed motions to bar the testimony of Navistar's expert witness. (*Sharp*, Dkt. No. 134; *Luther*, Dkt. No. 193.)[1] Due to the common issues, the Court addresses both sets of motions together for the sake of judicial economy. For the following reasons, Plaintiffs' motions to bar Navistar's expert are granted in part and denied in part, their motions for partial summary judgment are denied, and Navistar's motions for summary judgment are granted in part and denied in part.

## BACKGROUND

The parties have numerous factual disputes relevant to the cross-motions for summary judgment that will be discussed in the context of their arguments. But they generally agree on the sequence of events giving rise to the present action. Accordingly, the following facts are undisputed.

## I.     The ESA Plan and Plaintiffs' Employment with Navistar

Sharp served as Navistar's Senior Vice President for Enterprise Services from August 2007 until he was terminated without cause on April 30, 2013. (Defs.' Resp. to Pls.' Statement of Material Facts ("DRPSF") ¶¶ 3, 7, Dkt. No. 152; Pl.'s Resp. to Defs.' Statement of Facts

---

[1] The *Luther* action was originally assigned to a different judge in this District. That case was subsequently reassigned to this Court. (Dkt. No. 78.) The two cases were coordinated but not consolidated, and they remain separate cases. Thus, each Plaintiff has separately moved to bar Navistar's expert report and for partial summary judgment in their respective case. Likewise, Navistar filed its motion for summary judgment in both cases. In the interest of judicial economy, Luther incorporates Sharp's arguments and statements of fact (except for certain material facts specific to him) in support of his motions and in opposition to Navistar's motion. For that reason, the Court treats Sharp's submissions as if they were filed on behalf of both Plaintiffs. Moreover, unless otherwise noted, all record citations refer to the docket in *Sharp*.

("PRDSF") ¶ 3, Dkt. No. 150.) Luther joined Navistar as its Vice President of Military Products and Initiatives in September 2009 and was later promoted to Vice President of Portfolio, Planning, and Program Management. (Defs.' Resp. to Luther's Statement of Material Facts ¶ 3, Dkt. No. 152.) Luther was terminated from Navistar without cause on June 30, 2014. (*Id.* ¶ 7.) Both Sharp and Luther were participants in Navistar's ESA plan within the meaning of 29 U.S.C. § 1002(7), and their ESAs were substantially identical in all material respects. (DRPSF ¶ 3; Defs.' Resp. to Luther's Statement of Material Facts ¶ 3; PRDSF ¶ 5.)

One of the purposes of Navistar's ESA plan was "to assure stability and continuity of its senior management." (DRPSF ¶ 4.) To that end, Navistar's ESA plan provided its executives greater severance payments if their employment was terminated in the 36 months following a "Change in Control" at the company. (DRPSF ¶¶ 4–5, PRDSF ¶ 6.) The severance payments were increased because Navistar recognized that the possibility of organizational changes, such as a change in control, "negatively affects or may negatively affect the retention of senior management personnel of [Navistar], the decision-making and performance of such personnel with respect to such organizational changes, and the effectiveness of retention and incentive features or other elements of the executive compensation programs of" Navistar. (DRPSF ¶ 4.) As relevant here, a "Change in Control" occurs under Paragraph 3 of the ESA where:

> (a) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934[)] . . . is or becomes the "beneficial owner" . . . directly or indirectly, of securities of the Company . . . representing twenty five percent (25%) or more of the combined voting power of the Company's then-outstanding securities . . . [or]
>
> (b) the following individuals cease for any reason to constitute more than three-fourths (3/4) of the number of directors then-serving on the Board of Directors of the Company (the "Board"): individuals who constitute the Board as of the Effective Date and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including, but not limited to, a consent solicitation, relating to the election of directors of the

Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved by the vote of at least two-thirds (2/3) of the directors then still in office . . . .

(DRPSF ¶ 4; PRDSF ¶ 6.)

On March 27, 2013, Sharp received a notice of termination informing him that he would receive non-change-in-control termination benefits pursuant to the ESA, conditional on his signing of an attached General Release. (Pls.' Resp. to Defs.' Statement of Additional Facts ("PRDSAF") ¶¶ 66–67, Dkt. No. 173.) That General Release stated that in exchange for his ESA severance payment, Sharp waived "any claims, demands, liabilities and causes of action that arise from any and every kind, nature and character, based upon any act or omission occurring prior to the date of [his] signing [of the] General Release, including but not limited to [his] employment with or termination of employment from" Navistar. (*Id.* ¶ 68.) However, the General Release contained an exception stating that its terms did not extend to Sharp's "right to enforce the terms of the [ESA]." (*Id.*) In return for signing the General Release, Sharp received an ESA payment of $990,000 along with an additional payment of $19,000 in lieu of the outplacement services he was entitled to receive under the ESA. (*Id.* ¶ 69.) Similarly, Luther also received non-change-in-control severance of $711,450, which he received after signing the General Release on August 13, 2014. (Defs.' Response to Luther's Statement of Material Facts ¶ 7); *Luther v. Navistar Int'l Corp.* ("*Luther I*"), No. 15 C 3120, 2016 WL 3568809, at *3 (N.D. Ill. July 1, 2016).

## II. Activist Shareholders Seek Representation on Navistar's Board of Directors

In 2011, well-known "activist" investor Carl Icahn began to buy shares of Navistar stock through his investment firm, Icahn Enterprises. ("Icahn" will be used herein to refer to Icahn individually as well as when he acts through his affiliates.) (DRPSF ¶ 8, PRDSF ¶ 15.) Typically, Icahn invests in companies he believes to be undervalued or mismanaged. (PRDSF ¶ 15.) At the

time Icahn invested in Navistar, the company had spent a significant sum of money on an engine strategy based on a technology that ultimately failed to comply with the Environmental Protection Agency's 2010 emissions standards. (*Id.* ¶¶ 16–17.) Consequently, Navistar experienced a decrease in its stock price and market share, loss of sales, negative press, regulatory investigations, and litigation. (*Id.* ¶ 17.)

Icahn's initial investment in Navistar was equal to 9.80% of Navistar's outstanding shares. (*Id.* ¶ 18.) Shortly after his initial investment, Navistar's Board of Directors ("Board") met with representatives of Bank of America Merrill Lynch, who made a presentation to the Board entitled "Carl Icahn and Defense Preparedness." (DRPSF ¶ 9.) Around the same time, Icahn began discussions with Navistar concerning the company's strategy and the possibility of him having representation on Navistar's Board. (DRPSF ¶ 8; PRDSF ¶ 19.) Following those discussions, Icahn and Navistar entered into a standstill agreement on November 14, 2011 ("2011 Standstill"). (DRPSF ¶ 10; PRDSF ¶ 21.) Under the 2011 Standstill, Navistar agreed, among other things, to put forth a management proposal for the company's 2012 annual shareholder meeting to declassify immediately its Board, put six Board seats up for election at the 2013 annual meeting, and limit the size of the Board to eleven members. (*Id.*) In exchange, Icahn agreed to support Navistar's nominees for election to the Board at the 2012 annual meeting and not to solicit proxies or wage a proxy fight[2] prior to that meeting. (*Id.*)

In June 2012, Mark Rachesky made an initial investment in Navistar amounting to 13.6% of the company's outstanding shares through his private equity firm MHR Fund Management, LLC. ("Rachesky" will be used herein to refer to Rachesky individually as well as when he acts through his affiliates.) (DRPSF ¶ 11; PRDSF ¶¶ 23–24.) According to Rachesky, he targets

---

[2] A corporate election contest is typically referred to as a proxy contest or fight. (Expert Report of Edward B. Rock at 3 n.1, Dkt. No. 135-1.)

5

"companies who are distressed or who [he] thinks [he] can help a lot and improve long term holders." (PRDSF ¶ 23.) Rachesky found Navistar to be an attractive investment because one of his employees had a favorable view of the company, and the company's stock price was low due to its ongoing problems. (*Id.* ¶ 25.) When Icahn learned of Rachesky's investment, he felt "a little annoyed" that Rachesky had chosen to invest in Navistar out "of all the stocks he could buy." (*Id.* ¶ 26.) Although Rachesky had once worked for Icahn in the 1990s before starting his own firm, the two had a falling out when they engaged in a public battle for control over Lions Gate Entertainment Corp. ("Lionsgate") between 2009 and 2011. (*Id.* ¶¶ 23, 26.) At their depositions in these cases, Icahn testified that he did not want to "have any dealings" with Rachesky, and Rachesky compared his relationship with Icahn to "oil and water." (*Id.* ¶¶ 27, 28.)

Navistar's business already faced significant challenges in the summer of 2012 because its solution for meeting federal and state emissions requirements was likely to be either unsuccessful or more costly than anticipated. (*Id.* ¶¶ 30, 44.) Moreover, not only was Icahn seeking Board representation, Rachesky also made it known to Navistar that he wanted representation on the Board as well. (DRPSF ¶ 11; PRDSF ¶¶ 50, 52.) According to Rachesky, he was "a friendly shareholder" who simply wanted seats on Navistar's Board "to help the company grow and change [its] strategy." (PRDSF ¶ 52.)

For assistance with these challenges and guidance on the company's strategy, Navistar met with a number of third-party advisors. (*Id.* ¶ 31.) During that process, Navistar heard pitches from several investment bankers concerning the issues Navistar faced with its investors. (*Id.* ¶ 32.) One of those bankers, Goldman Sachs, set out various strategies Navistar could adopt with respect to activist investors. (DRPSF ¶ 13.) In particular, Goldman Sachs laid out alternative scenarios to guide Navistar's discussions with Icahn and Rachesky and identified steps the two had taken with

6

other companies. (PRDSF ¶ 49.) During that presentation, Goldman Sachs suggested the possibility that Icahn and Rachesky would launch a proxy fight and advertised its success in defending its clients in proxy fights waged by activist investors. (DRPSF ¶ 13.) But Goldman Sachs also set out a number of other potential approaches that Icahn and Rachesky could take with respect to Navistar, "including meeting with management for a resolution of any concerns, making public demands on Navistar, bidding for all or part of Navistar, filing shareholder proposals . . . or simply going away after requests were denied." (PRDSF ¶ 49.) On June 19, 2012, Navistar retained Goldman Sachs to serve as the company's "overall financial advisor," with a portfolio consisting of a "panoply" of issues the Board had to worry about, including responding to potential activism by any of Navistar's shareholders, including Icahn and Rachesky. (DRPSF ¶ 14; PRDSF ¶¶ 33–35.)

That same day, Navistar's Board adopted a Shareholder Rights Plan, which was "designed to deter coercive takeover tactics including the accumulation of shares in the open market or through private transactions and to prevent an acquirer from gaining control of the Company without offering a fair and adequate price to all of the Company's stockholders." (DRPSF ¶ 16; PRDSF ¶ 38.) Under the Shareholder Rights Plan, if any Navistar shareholder acquired an amount of shares equal to 15%[3] of the company's outstanding shares, all other Navistar shareholders would be afforded the right to buy preferred shares of Navistar stock at a discounted rate, thereby diluting the ownership stakes of those shareholders who exceeded the 15% threshold. (PRDSF ¶¶ 39, 41.) As of July 2012, Rachesky and Icahn, respectively, held 14.98% and 14.54% of

---

[3] The 15% threshold was increased to 20% in July 2013. (PRDSF ¶ 38.)

Navistar's outstanding shares. (*Id.* ¶ 40.) Altogether, four institutional investors, including Icahn and Rachesky, held over 50% of Navistar's stock.[4] (*Id.*)

Over the course of the summer of 2012, Navistar also continued to have discussions with its various shareholders, including Icahn and Rachesky. (*Id.* ¶ 48.) Often, Navistar sought advice from Goldman Sachs before its meetings with investors. (*Id.* ¶ 49.) During one presentation, Goldman Sachs outlined potential proxy-fight scenarios involving Icahn and Rachesky and suggested that winning the support of Rachesky in a proxy fight could require placing him on the Board. (DRPSF ¶ 18.) Goldman Sachs also warned Navistar that during proxy fights, activist investors frequently propose new Chief Executive Officers ("CEOs") and that Navistar's then-CEO Dan Ustian's seat on the Board was likely to be targeted indirectly even though his seat was not imminently up for election. (*Id.*) Goldman Sachs further advised Navistar that in a proxy fight, activists often target long-tenured Board members, and it suggested that new directors would be more effective advocates for the company. (*Id.* ¶ 19.) However, due to the 2011 Standstill, adding new directors would require existing Board members to resign. (*Id.*)

On July 5, 2012, Navistar's Board established the Saratoga Oversight Special Committee ("Saratoga Committee"), whose stated purpose was:

> to review, oversee and monitor strategic matters affecting the company, including, without limitation (1) resolution of the company's emission strategy, (2) financing and liquidity matters affecting the company, (3) the company's communication strategy, (4) governance matters and/or proxy contests, and (5) the company's strategic plan and defensive measures; and to report its findings and make recommendations thereon back to the full Board.

(DRPSF ¶ 17; PRDSF ¶ 43.) The Saratoga Committee consisted of four Board members, including Michael Hammes and James Keyes. (PRDSF ¶ 43.) It was formed as part of the Board's

---

[4] One of those institutional investors held more than 15% of Navistar's stock at the time the Shareholder Rights Plan was adopted but was grandfathered in, and so the provision granting all other shareholders an opportunity to buy preferred stock at a discount did not activate. (PRDSF ¶¶ 40, 42.)

broader internal effort to "take a more direct participation in [the] whole range of issues" faced by the company in the summer of 2012. (*Id.* ¶ 44.) In mid-July, Goldman Sachs made a presentation to the Saratoga Committee in which it advised Navistar to appoint an independent director search firm. (DRPSF ¶ 20.) Shortly thereafter, Navistar retained Heidrick & Struggles to assist the Board in locating a potential new CEO and independent director candidates. (*Id.*)

By August 2012, Icahn and Rachesky made it clear that they each wanted two Board seats. (DRPSF ¶ 22; PRDSF ¶ 50.) Goldman Sachs gave a presentation to the Saratoga Committee in mid-August during which Goldman Sachs set forth several potential settlement scenarios involving either Icahn or Rachesky or both. (DRPSF ¶¶ 22, 24.) For certain of those scenarios, Goldman Sachs listed as a consideration that the "[e]xlcuded party (MHR or Icahn) [would be] likely to wage a proxy fight." (*Id.*) In another scenario, Goldman Sachs stated that it would be difficult for Navistar "to chart a course of changes that would result in a solid chance of success in a proxy fight." (*Id.*) Goldman Sachs also set forth scenarios in which settlements with Rachesky and Icahn would remove the risk of a proxy fight. (*Id.*) During this time, Hammes kept the Board updated on Goldman Sachs's advice for dealing with Icahn and Rachesky, which included "possible changes in the composition of the [B]oard, [the] rationale for such changes and a procedure to effect such changes." (*Id.* ¶ 25.)

Near the end of August, Navistar removed Ustian from his positions as CEO and Board Chairman and named Lewis Campbell as the company's interim CEO and Executive Chairman of the Board. (DRPSF ¶ 26; PRDSF ¶ 47.) Shortly thereafter, Hammes advised Campbell that Navistar was at risk of a proxy fight from Icahn or Rachesky and that the company "ought to be careful." (DRPSF ¶ 27.) Hammes also told an advisor with Heidrick & Struggles that he had been told that Navistar would not start the search for a permanent CEO until it had "the activists

'resolved'—I.e. [*sic*] are 'sure' we don't have a proxy fight going etc." (DRPSF ¶ 28.) He further stated that he expected that four Board members would be replaced, "two by activists and two by new Independents" and that the "type of independent directors [Navistar] would like to find for the board is interrelated with the negotiations with the activists." (*Id.*) Also around that time, Navistar's then-Chief Operating Officer, Troy Clarke, told an associate that he was advised that Campbell was brought in to head off an anticipated proxy fight from Icahn or the company's other activist investors. (*Id.* ¶ 27.)

In early September 2012, Navistar offered one seat on the Board to Icahn and one seat to Rachesky, requesting in exchange that each investor sign a standstill agreement that would, among other things, preclude him from running a proxy contest. (DRPSF ¶ 34; PRDSF ¶¶ 52, 54.) However, both Icahn and Rachesky rejected the offers. (DRPSF ¶ 34; PRDSF ¶ 54.) Each investor indicated that he wanted two seats on the Board. (PRDSF ¶¶ 55–56.) After turning down Navistar's offer, Icahn publicly issued an open letter to Navistar's Board on September 9, 2012, in which he criticized Navistar's regulatory compliance, declining market share and share price, and decision to hire Campbell as interim CEO without shareholder input or approval. (*Id.* ¶ 58.) In addition, the letter stated the following:

> This is a Board at war with its own shareholders. I urge you to reconsider the path the Board has chosen, which harms our company and puts you at serious risk of personal liability. Instead, I recommend that you permit the voices of shareholders to be heard directly at the Board level by making four Board seats available to shareholders immediately—at this critical juncture in the history of Navistar— before any more damage is done to our company by the existing Board.

> I would prefer to amicably resolve this matter now, rather than through protracted litigation and a proxy fight. However, I am sure that you have no doubt that I will proceed with both, if necessary, to protect my investment and the interest of all shareholders.

(DRPSF ¶ 35; PRDSF ¶ 58.) Navistar responded to Icahn's open letter the next day with a press release that condemned Icahn's "unproductive tactics of threats, attacks, and disruption." (DRPSF ¶ 36.) That led Icahn to issue his own press release directed to Navistar shareholders on September 11, 2012, stating that he had been "attempting to avoid conflict" but his "hopes have been dashed." (DRPSF ¶ 37.) Icahn concluded his press release by stating that:

> I would prefer to amicably resolve this matter with Navistar and not engage in the tiresome and expensive process of protracted litigation and a proxy fight. However, if the Board fails to recognize the owner to have a legitimate say in the conduct of the business that it owns, then I will have little choice but to do this "the hard way."

(DRPSF ¶ 37; PRDSF ¶ 60.) The same day, Icahn sent Navistar a books and records demand under Delaware Code Section 220. (DRPSF ¶ 37; PRDSF ¶ 61.) In the demand letter, one of Icahn's stated purposes for seeking the records was to determine "whether and how to conduct a proxy contest." (DRPSF ¶ 37.)

On September 13, 2012, the Saratoga Committee held meetings that Hammes described as "organized to be a discussion of those steps we need to do/plan in the even [*sic*] that there is a proxy fight in order to maximize our chances of being as successful as possible in such a situation." (*Id.* ¶ 41.) Goldman Sachs and Navistar's outside counsel attended one of those meetings. (*Id.* ¶ 42.) Topics covered included establishing a working team to deal with a possible proxy contest, possible changes in the composition of the Board, and other governance changes. (*Id.* ¶¶ 42–43.) In addition, the Saratoga Committee reviewed a timeline for key dates for director elections and a potential proxy fight. (*Id.* ¶ 42.) During a Board meeting later that same day, Campbell discussed the continued search for new Board nominees. (*Id.* ¶ 43.)

Hammes sent an email to Navistar's Board on September 20, 2012, which included a summary of the negotiations with Icahn and Rachesky up to that date:

[W]e offered to both [Rachesky] and [Icahn] one director apiece—which they rejected. We then offered two directors to [Rachesky]—which he rejected because he then took a position that he didn't want to sign any form of standstill (which we of course rejected). Following an informal idea I put to [Icahn] and [Rachesky] the board authorized us to say to [Icahn] and [Rachesky]—if one or the other came in with a written proposal for one each with a third one to be chosen jointly by them in the context of an 11 person board (along with appropriate standbys of course) the board would consider such a written proposal.

The responses to date have been—by both [Rachesky] an [*sic*] [Icahn] to not agree to the one one and one opportunity and "officially" they have each stayed with the position of—I ([Rachesky or Icahn]) want two seats and and [*sic*] I want you to offer two seats to the other group and then we would consider a standstill. (We have firmly rejected any version of giving them four seats out of our 11 member board limit and I believe they understand and believe that is a very firm position by the Navistar board that will not change.)

Although that has been the "official" response to date (and may remain in the final response) one does get the feeling that they are individually considering other alternatives in order to settle. [Rachesky's] outside counsel (whom Chip knows) has discussed with Chip that he believes [Rachesky] probably would agree with 2 seats for [Rachesky]—with no requirement to give [Icahn] two seats and he'd sign a standstill (which they have seen the draft version of). Whether [Rachesky] will follow thru with this position (which is what we offered to him up front after they both rejected on [*sic*] apiece) is yet to be seen. In addition, [Icahn] continues with phone calls to John about—"we don't want to turn the lawyers loose etc etc and what's Navistar's proposal?" John's response to these phone calls has been exactly what we have discussed—[Icahn]—the ball is in your court—we will not agree with 4 directors out of 11 in any way shaper [*sic*] or form—and we have told you if you want to put a proposal in writing to Navistar (Steve Covery) [*sic*] for one and one with a third one to be chosen jointly by you and [Rachesky] (within a context of 11 directors) the board would consider such a proposal assuming of course that appropriate standstills were signed.

(*Id.* ¶ 45.) Throughout September, Navistar continued negotiations with Icahn and Rachesky because the company "wanted to resolve any issues with shareholders, not just Icahn, in a friendly way because it needed to settle down all the publicity and all that." (PRDSF ¶ 67.) Navistar believed that earning Icahn's and Rachesky's support for the Board would "calm down the whole uncertainty and consternation Navistar had throughout its whole investor base." (*Id.*) On October 1, 2012, Navistar made a new offer to Icahn under which, if Icahn agreed to sign a standstill

agreement, Navistar would extend the same deal to Rachesky. (*Id.* ¶ 69.) Then, if Rachesky accepted the deal, both Icahn and Rachesky would be able to nominate a single Board member and the two could jointly appoint a third director ("Mutual Designee"). (*Id.*) If Rachesky did not accept the deal, however, Icahn would receive two seats on the Board and Rachesky would receive none. (*Id.*)

Ultimately, Icahn accepted Navistar's offer on October 5, 2012. (DRPSF ¶ 49; PRDSF ¶ 70.) The proposal was then extended to Rachesky, who accepted the deal two days later on October 7. (*Id.*) At Rachesky's request, Icahn's agreement was amended to mirror Rachesky's agreement. (PRDSF ¶ 71.) As memorialized, both agreements were effective October 5, 2012. (DRPSF ¶ 49; PRDSF ¶ 70.) Under both settlement agreements, Icahn and Rachesky agreed not to "solicit proxies or otherwise conduct a proxy contest." (DRPSF ¶ 51.) On October 8, 2012, Board members Eugenio Clariond and Steven J. Klinger left the Board. (DRPSF ¶ 52; PRDSF ¶ 98.) Rachesky was chosen to replace Klinger as Rachesky's designee to the Board pursuant to his settlement agreement with Navistar. (DRPSF ¶ 52; PRDSF ¶ 99.) Similarly, pursuant to his settlement agreement, Icahn's designee, Vincent J. Intrieri, was selected to replace Clariond. (DRPSF ¶ 52; PRDSF ¶ 100.) After Icahn and Rachesky were unable to reach agreement as to their Mutual Designee to the Board pursuant to their respective settlement agreements, Icahn won the right to choose the Mutual Designee by coin flip. (DRPSF ¶ 52; PRDSF ¶ 108.) Icahn chose Samuel J. Merksamer, who replaced the departing Diane H. Gulyas. (DRPSF ¶ 52; PRDSF ¶¶ 107–08.) One other Board member, David D. Harrison also opted to retire in October 2012 and was replaced by John C. Pope. (DRPSF ¶ 52; PRDSF ¶¶ 101–04.) While the parties disagree as to whether Harrison's departure and Pope's appointment were "in connection" with Icahn and Rachesky's settlement agreements, it is undisputed that neither settlement agreement gave either

investor any say in choosing Harrison's replacement. (*Id.*) All four new Board members were unanimously appointed to the Board. (PRDSF ¶ 112.)

### III. Navistar's Determination that a Change in Control Had Not Occurred

The turnover of four Board seats in October 2012 raised questions regarding whether there had been a change in control under the ESA, and so the Board's Compensation Committee reviewed the issue. (PRDSF ¶ 115.) On October 25, 2012, the Compensation Committee determined that a change in control, as defined under the ESA, had not occurred. (*Id.*) After the Board decided to replace Campbell as Navistar's CEO and Executive Chairman of the Board, Campbell raised the issue of whether he was entitled to change-in-control benefits under his ESA. (DRPSF ¶ 54; PRDSF ¶ 118.) Although Campbell later stated that he was not confident that he was entitled to such payments, he thought it was reasonable to raise the issue to give him "some room to negotiate because he wasn't real sure how he was going to be treated as far as his severance package was concerned." (PRDSF ¶ 118.) Similarly, Navistar's former Chief Financial Officer also claimed that his 2013 termination was in connection with a change in control. (DRPSF ¶ 54.)

During a March 5, 2013 meeting concerning Campbell's separation from Navistar, the full Board unanimously confirmed that no change in control had occurred under the terms of the ESA. (PRDSF ¶ 115.) Subsequently, Campbell withdrew his assertion of a change in control and later testified that he agreed with the Board's determination. (*Id.* ¶ 119.) Navistar's former Chief Financial Officer also withdrew his assertion of a change in control. (DRPSF ¶ 54.)

### DISCUSSION

Sharp and Luther filed their respective actions under ERISA, 29 U.S.C. § 1132(a)(1)(B), which allows a plan participant to bring a civil action to recover benefits due under the terms of

the plan or to clarify the participant's rights to future benefits under the terms of the plan. Here, each Plaintiff claims he is entitled to greater severance payments than he received because he was terminated within 36 months of a change in control, as defined under the ESA. Plaintiffs advance two theories in support of their contention that there was a change in control at Navistar. First, they argue that a change in control occurred as defined under paragraph 3(b) of the ESA because three or more seats on Navistar's Board changed in connection with a threatened election contest. Second, Plaintiffs contend that there was a change in control as defined under paragraph 3(a) of the ESA because Icahn and Rachesky were a "group" whose ownership interest in Navistar exceeded 25% of the company's outstanding shares.

Navistar and Plaintiffs each have moved for summary judgment. Plaintiffs seek summary judgment on the issue of Navistar's liability and based only on their threatened election contest theory. Specifically, Plaintiffs ask that the Court find that there is no genuine dispute of material fact that at least three Navistar Board members were replaced in connection with a threatened election contest. Meanwhile, Navistar seeks summary judgment based on its belief that Plaintiffs cannot prevail under either theory of liability. In addition, Plaintiffs have filed a motion to bar the testimony of Navistar's expert witness, claiming that it does not meet the standard set forth by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[5] The Court will first address Plaintiffs' *Daubert* motion before turning to the parties' cross-motions for summary judgment.

## I.  Motion to Bar Navistar's Expert Witness

Navistar has proffered the expert report and testimony of Edward B. Rock, who is the Martin Lipton Professor of Law at New York University School of Law and serves as the director

---

[5] As with the motion for summary judgment, Luther filed a separate *Daubert* motion that incorporates Sharp's brief in support of his motion.

of the school's Institute for Corporate Governance and Finance. Rock's expert opinions focus on corporate governance and the dynamics of active engagement by major shareholders. Navistar has used Rock's expert opinions both to support its motion for summary judgment and to oppose Plaintiffs' partial motion for summary judgment, and it intends to call Rock as a witness in a potential bench trial. However, Plaintiffs contend that Rock's expert opinions are improper and should be barred.

Federal Rule of Evidence 702 and *Daubert* govern the admissibility of expert testimony. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"In *Daubert*, the Supreme Court interpreted Rule 702 to require the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017) (internal quotation marks omitted). The district court's gatekeeping function requires the court to engage in a three-step analysis before admitting expert testimony. *Id.* at 779. Specifically, it must evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Id.* The proponent of the expert bears the burden of demonstrating by a preponderance of the evidence that the expert's testimony

16

satisfies the *Daubert* standard. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

This Court easily concludes that Rock is qualified to opine on corporate governance issues. Since 1989, Rock has taught various classes on corporate law and he is widely published in that field. Indeed, Plaintiffs do not seriously challenge Rock's qualifications to offer expert testimony in this case. Instead, Plaintiffs argue that Rock's opinions should be barred in whole, or at least in part, because he impermissibly seeks to instruct the Court on how to interpret the terms of the ESA. Broadly, their objections encompass the relevance of Rock's testimony and the reliability of his methodology.

In general, any "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). Moreover, the Seventh Circuit has explained that arguments about the meaning of contracts "belong[] in briefs, not in 'experts' reports.'" *RLJCS Enters., Inc. v. Pro. Benefit Tr. Multiple Emp. Welfare Benefit Plan & Tr.*, 487 F.3d 494, 498 (7th Cir. 2007). At the same time, "[t]here is a difference between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts." *United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007).

For the most part, Rock offers permissible expert testimony concerning topics such as the impact of the rise of activist investors in the modern corporate governance landscape and the mechanics of undertaking a proxy fight. Such testimony would likely help the trier of fact to understand the corporate governance concepts at issue in this action and also provides context concerning interactions between activist investors and the companies in which they invest. *See, e.g.*, *United States v. Welch*, 368 F.3d 970, 974 (7th Cir. 2004) ("[E]xpert testimony is helpful to

the jury if it concerns a matter beyond the understanding of the average person, assists the jury in understanding facts at issue, or puts the facts in context."), *vacated on other grounds*, 543 U.S. 1112 (2005). Further, Rock's opinions on whether Icahn or Rachesky were capable of actually waging a viable proxy fight at Navistar do not exceed permissible boundaries, as those opinions would likely assist the fact-finder determine whether there was a threatened election contest. As discussed below, that inquiry would likely benefit from an expert's understanding of whether Icahn's or Rachesky's conduct indicated an intent to wage a proxy fight for control of Navistar's Board and whether those investors' threat to wage a proxy fight was credible. *See, e.g.*, *WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc.*, 25 F.3d 422, 429 (7th Cir. 1994) (affirming the admission of expert testimony on customs and practices in the commercial real estate industry); *CDX Liquidating Tr. ex rel. CDX Liquidating Tr. v. Venrock Assocs.*, 411 B.R. 571, 588–89 (N.D. Ill. 2009) (allowing expert's opinion concerning the defendants' conduct in light of industry practices and standards of corporate governance); *Cary Oil Co. v. MG Refining & Mktg., Inc.*, No. 99 Civ. 1725(VM), 2003 WL 1878246, at *7 (S.D.N.Y. Apr. 11, 2003) (allowing an expert to opine on oil industry customs with regard to fuel storage alternatives in order to assist the jury in deciding whether it would have been feasible for the plaintiffs to take delivery of the quantities of fuel called for by their contract with the defendants). And Rock's opinions on those topics are reliable, as they are based on the evidence in this case, corporate law scholarship, and his extensive experience in and knowledge of corporate law. *See United States v. Conn*, 297 F.3d 548, 556 (7th Cir. 2002) ("[I]n certain fields, experience is the predominant, if not the sole, basis for a great deal of reliable expert testimony." (internal quotation marks omitted)); *Cement-Lock v. Gas Tech. Inst.*, No. 05 C 0018, 2007 WL 6947911, at *2 (N.D. Ill. Dec. 11, 2007) (finding an expert's opinions

18

reliable where he evaluated the evidence in the record "in light of his extensive experience in and knowledge of the business world").

Yet certain of Rock's opinions go too far in dictating to the fact-finder the ultimate conclusions she should reach. First, Rock's opinion on the interpretation of the term "group" as defined in paragraph 3(a) of the ESA by reference to Section 13(d) of the Williams Act, 15 U.S.C. § 78m(d), amounts to legal argument that should be presented in Navistar's briefs rather than by way of expert testimony. *Roundy's Inc. v. NLRB*, 674 F.3d 638, 648 (7th Cir. 2012) (affirming the exclusion of an expert whose opinion "amount[ed] to legal arguments that should be presented to the court in counsel's analysis, not expert opinion testimony"). That discussion ends with Rock's opinion on the ultimate issue of whether Icahn and Rachesky had formed a Section 13(d) "group." (Sharp's Br. in Supp. of Mot. to Bar the Report of Defs.' Expert, Ex. A ¶ 113, Dkt. No. 135-2.) The proper interpretations of language in a federal statute and contract terms are matters of law for the Court to determine.

Similarly, Rock opines that "a reasonable person would ***not*** take Icahn's actions or statements in his various letters as a threat to launch a 'proxy contest'" and that Rachesky "took no actions that a reasonable person would interpret as threatening a proxy contest." (*Id.* ¶ 52.) While the fact-finder may find it helpful to hear Rock's expert views on whether Icahn's actions or statements were consistent with actions necessary to wage a proxy contest, the ultimate question of whether Icahn's action actually constituted a threated election context should be reserved for the fact-finder. While "[a]n opinion is not objectionable just because it embraces an ultimate issue," Fed. R. Evid. 704, it generally will not be appropriate for an expert simply to tell the fact-finder what result to reach or to opine on the legal implications of conduct. *See* Fed. R. Evid. 704(a), 1972 advisory committee notes. Put differently, it is acceptable for Rock to testify

about what sort of conduct indicates a threatened election contest but not for him then to conclude that, based on the actual facts here, no threat had been made. *See Scottsdale Ins. Co. v. City of Waukegan*, 689 F. Supp. 2d 1018, 1023 (N.D. Ill. 2010) ("[E]xperts may not testify as to the legal implications of conduct . . . ." (internal quotation marks omitted)).

Finally, Plaintiffs take issue with certain portions of Rock's deposition where he testified that the phrase "in connection with an actual or threatened election contest" in the ESAs is ambiguous and offers his interpretation of that phrase based on certain working assumptions. Plaintiffs contend that it is improper for an expert to interpret contractual language and take issue with the reliability of Rock's working assumptions. The Court need not decide whether Rock's working assumptions are reliable because it concludes that such testimony constitutes an inadmissible expert opinion on the proper interpretation of the ESAs. Although Rock claims that he is not offering testimony about the proper meaning of the ESAs, the clear implication is that he believes that the ESAs should be interpreted in line with his opinions. Such testimony is inadmissible as an expert is not permitted to opine on the proper interpretation of a contract. *Loeb v. Hammond*, 407 F.2d 779, 781 (7th Cir. 1969); *see also Aleksic v. Clarity Servs., Inc.*, No. 1:13-cv-07802, 2015 WL 4139711, at \*6 (N.D. Ill. July 8, 2015) ("It is well settled in this circuit that experts may not ordinarily be called to explain what a contract means."); *Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 636 (N.D. Ill. 2006) (holding that an expert is "not permitted to offer his opinion on how, as a matter of law, the contract should be construed").

In short, the Court declines to bar Rock's expert testimony in its entirety, as many of his opinions are helpful to understanding the various corporate governance concepts at issue in this case. However, to the extent that Rock offers legal conclusions properly reserved for the Court and opinions on ultimate issues for which his expert testimony provides little help to the fact-

finder other than to dictate his preferred outcome, his opinions are barred and will not be considered in this Court's analysis of the cross-motions for summary judgment.

## II.     Cross-Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). In evaluating cross-motions for summary judgment, the Court must take "the facts in the light most favorable to the non-movant, first for one side and then for the other." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Loc. Union 150, AFL-CIO*, 335 F.3d 643, 648 (7th Cir. 2003).

Both sides in these cases have moved for summary judgment based on Plaintiffs' theory that three Navistar Board members were replaced in connection with a threatened election contest. In addition, Navistar seeks summary judgment because Plaintiffs' theory that Icahn and Rachesky formed a "group," as defined under the ESA, that acquired more than 25% of Navistar's outstanding shares fails as a matter of law. Before addressing the substance of the parties' arguments, however, the Court will address Navistar's contention that Plaintiffs violated the procedural requirements of Northern District of Illinois Local Rule 56.1.

### A.     Local Rule 56.1 Compliance

Navistar argues in its reply in support of its motion for summary judgment that Plaintiffs' response to Navistar's statement of facts in support of its motion for summary judgment should be struck because it fails to comply with Northern District of Illinois Local Rule 56.1(b)(3). Local Rule 56.1 requires the party moving for summary judgment to submit a statement of material facts

that it contends are undisputed and entitle it to summary judgment. L.R. 56.1(a)(3). The statement of facts "shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." L.R. 56.1(a). On the other hand, the party opposing summary judgment must file a "concise response to the movant's statement." L.R. 56.1(b)(3). The response should respond to each numbered paragraph in the moving party's statement and where the opposing party disputes a fact, it must include specific references to the affidavits, parts of the record, or other supporting materials relied on to controvert the fact. *Id.*

According to Navistar, Plaintiffs' response to Navistar's statement of facts fails to comply with Local Rule 56.1(b)(3) because when they dispute one of Navistar's factual assertions, Plaintiffs do not cite specific admissible evidence but instead cite various paragraphs from their statement of material facts in support of their own motion for partial summary judgment or their statement of additional facts in opposition to Navistar's motion for summary judgment. While Plaintiffs' cross-references do not perfectly comply with Local Rule 56.1(b)(3), any non-compliance does not warrant the severe sanction of striking Plaintiffs' entire response. The referenced statements of facts themselves contain references to the factual record. Moreover, most of the cross-references are made in responses where Plaintiffs state that Navistar's factual assertion is "undisputed but incomplete." In such circumstances, Plaintiffs simply ask the Court to consider the undisputed factual assertion by Navistar in context with their own factual assertions. For those few instances where Plaintiffs genuinely dispute a fact, the cross-references are often unhelpful—particularly where they direct the Court to dozens of their factual statements. Nonetheless, so long as the Court can discern the basis for Plaintiffs' dispute from the cross-reference, the Court will treat the factual statement as properly disputed.

### B.    Plaintiffs' Group Theory

Under paragraph 3(a) of the ESA, a change in control occurs when any "group" becomes the beneficial owner of 25% or more of Navistar's outstanding shares. Plaintiffs contend that Icahn and Rachesky formed a group for purposes of the ESA that acted in concert to replace members of Navistar's Board with their own designees. However, Navistar argues that the fact that Icahn and Rachesky both sought representation on Navistar's Board does not mean there was an agreement between the two to pursue a common goal. Instead, Navistar asserts that the undisputed evidence shows that Icahn and Rachesky acted separately in seeking Board representation and therefore it is entitled to summary judgment on Plaintiffs' group theory.

The term "group" in the ESA is defined by reference to Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, which were added by the Williams Act of 1968, Pub. L. No. 90-439, 82 Stat. 454 (codified at 15 U.S.C. §§ 78m(d), 78n(d)). Relevant here, Section 13(d) imposes certain disclosure requirements on any person or group that is the beneficial owner of 5% or more of a company's shares. The statute's definition of "person" encompasses a situation where "two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer." 15 U.S.C. § 78m(d)(3). In turn, the underlying regulation defines a group as follows:

> When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of section[] 13(d) . . . as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.

17 C.F.R. § 240.13d-5(b)(1).

The Seventh Circuit has held that a Section 13(d) group is formed by an agreement "to act in concert to acquire additional shares" in support of a "common objective." *Bath Indus., Inc. v.*

*Blot*, 427 F.2d 97, 109–10 (7th Cir. 1970); *see also CSX Corp. v. Child.'s Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 283 (2d Cir. 2011) ("The touchstone of a group within the meaning of section 13(d) is that the members combined in furtherance of a common objective." (internal quotation marks omitted)). This interpretation "does not proscribe informal discussion among existing shareholders concerning the performance of current management." *Bath Indus.*, 427 F.2d at 110. To prove the existence of a group, there must be "sufficient direct or circumstantial evidence to support the inference of a formal or informal understanding between members for the purpose of acquiring, holding, or disposing of securities." *CSX Corp.*, 654 F.3d at 283 (internal quotation marks omitted).

Here, the parties agree that Icahn and Rachesky acquired beneficial ownership of more than 25% of Navistar's shares. Thus, the question before the Court is whether there is sufficient direct or circumstantial evidence that the two investors shared a common purpose in doing so. Navistar argues that Plaintiffs have produced no evidence that Icahn and Rachesky ever agreed to pursue a common objective. To the contrary, according to Navistar, the undisputed evidence establishes that the two investors were acting separately, albeit each with the same objective of obtaining seats for themselves on Navistar's Board.

Navistar has adduced a substantial amount of undisputed evidence in support of its contention that Icahn and Rachesky were acting exclusively in their own interests. Most significantly, Icahn and Rachesky themselves testified that they had no interest in dealing with each other with respect to Navistar. Indeed, each investor testified that, at the time, there was lingering animosity between the two stemming from their battle for control over Lionsgate. (PRDSF ¶ 26.) Icahn stated that the fallout left him feeling "pretty angry" with Rachesky, and he had little desire to have any dealings with him. (*Id.* ¶¶ 26–27.) Similarly, Rachesky stated that he

and Icahn were not getting along with each other at the time he began buying Navistar shares. (*Id.* ¶ 28.) Rachesky's only contact with Icahn regarding Navistar prior to his initial investment was a "courtesy call" so that Icahn would learn of Rachesky's impending investment directly from him. (*Id.*) And Icahn stated that he was "a little annoyed" upon learning that Rachesky had decided to become involved with Navistar. (*Id.* ¶ 26.)

After Navistar made its first offer of one Board seat each to Icahn and Rachesky, Icahn testified that it was his position that he "wanted two [B]oard seats," and if it were up to him, Rachesky would have zero. (*Id.* ¶ 55.) He stated that he recalled telling Navistar that they should not give Rachesky any Board seats. (*Id.* ¶ 56.) Likewise, Rachesky testified that if it were up to him, he "would have two board seats and Carl would have zero" and he "certainly wouldn't have pushed that Carl had any board seats." (*Id.* ¶ 55.) When Navistar ultimately reached a settlement with Icahn and Rachesky to give each investor one Board seat along with a third Mutual Designee, Icahn and Rachesky could not even agree on who to name as the Mutual Designee. (*Id.* ¶ 108.) Instead, they settled their disagreement based on a coin toss. (*Id.*) In short, the undisputed evidence concerning Icahn and Rachesky's relationship weighs against a finding that the two did or would coordinate their activities with respect to their Navistar investments. *See Hallwood Realty Partners, LP v. Gotham Partners, LP*, 286 F.3d 613, 618 (2d Cir. 2002) (noting with approval that the district court found that "prior relationships" were relevant circumstantial evidence of the existence of a Section 13(d) group); *see also Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*, 115 F. Supp. 2d 440, 444 (S.D.N.Y. 2000) (listing prior and subsequent relationship 销 between members as relevant toward alleging the existence of a group).

In addition, Navistar points to the fact that both Icahn and Rachesky affirmed in their respective Schedule 13Ds[6] filed with the United States Securities and Exchange Commission ("SEC") in connection with their Navistar investments that they were not acting in concert with any other person with respect to Navistar stock. (*Id.* ¶¶ 18, 24, 42.) The SEC's regulations require any person holding shares as a member of a group to state as much in their Schedule 13D filing. 17 C.F.R. § 240.13d-101. By submitting their Schedule 13Ds, both Icahn and Rachesky certified that the information contained in their filings was "true, complete and correct." *Id.* Their certifications subjected each investor to criminal and civil penalties should their Schedule 13Ds contain a false or misleading statement. *See id.*; 15 U.S.C. § 78r(a); 18 U.S.C. § 1001(a).[7] Finally, Navistar did not show any signs of believing that Icahn and Rachesky were working together. Indeed, had the company concluded that the two investors had formed a group, it could have triggered the dilution provision of Navistar's Shareholder Rights Plan, as their combined investments would have exceeded the 15% threshold. But there is no dispute that those provisions were never triggered.

Plaintiffs point to the ruling denying Navistar summary judgment on the group theory in the *Luther* case, prior to its reassignment to this Court. In that ruling, the judge presiding over the case at the time denied summary judgment based on the same group theory argument that Navistar advances here. *Luther v. Navistar* ("*Luther II*"), No. 15 C 3120, 2017 WL 1197103, at

---

[6] Schedule 13D is the disclosure required to be filed under Section 13(d) by any person who becomes the beneficial owner of 5% or more of a company's shares within 10 days after such acquisition. 15 U.S.C. § 78m(d)(1). This disclosure requirement fulfills Section 13(d)'s purpose "to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 122–23 (2d Cir. 2001) (internal quotation marks omitted).

[7] Plaintiffs contend that Icahn's and Rachesky's Schedule 13D certifications that they were not acting as a group prove very little, since their silence is of little probative force. However, the Court finds that while their representations to the SEC are not determinative, they are nonetheless relevant evidence of whether the investors were acting as a Section 13(d) group.

*7–9 (N.D. Ill. Mar. 31, 2017). In doing so, the predecessor judge also emphasized that she was not ready to grant summary judgment for Navistar because the record had not been fully developed and "at least some case law support[ed]" the group theory. *Id.* at *7. Because Luther disputed many facts based on his need for further discovery, the predecessor judge gave Luther the opportunity to obtain further discovery to properly support his version of events. *Id.* at *9.

Now, with a fully developed record, this Court concludes that the evidence further strengthens Navistar's claim that Icahn and Rachesky were acting separately. Indeed, in her ruling, the predecessor judge observed that Luther had not yet deposed either investor or a representative from Navistar and suggested that such discovery might support his claim of coordination between Icahn and Rachesky. Since that ruling, Icahn and Rachesky have been deposed. But, as discussed above, their testimony only bolsters Navistar's contention that Icahn and Rachesky acted separately. Plaintiffs cannot create a triable issue of fact as to their group theory simply by challenging Icahn and Rachesky's credibility. *See, e.g.*, *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("[W]hen challenges to witness' credibility are ***all*** that a plaintiff relies on, and he has shown no independent facts—no proof—to support his claims, summary judgment in favor of the defendant is proper.").

To demonstrate a dispute of fact as to the group theory, Plaintiffs first set forth evidence showing that Navistar's negotiating efforts were always directed toward both investors. But the fact that Navistar dealt with Icahn's and Rachesky's demands for Board representation together does not demonstrate that the investors themselves were acting together. Given that two of Navistar's largest investors were simultaneously demanding Board representation for themselves, it makes sense that Navistar would deal with both demands jointly. Moreover, the evidence shows that Navistar feared that if it did not reach a resolution that was mutually agreeable to both

investors, the dissatisfied investor might wage a proxy fight. (*See* DRPSF ¶ 39.) Thus, for Navistar, the investors' demands for Board representation were inextricably linked. Further, Navistar saw a benefit to keeping both Icahn and Rachesky happy because their support for the Board could potentially calm a nervous investor base. (PRDSF ¶ 67.)

The strongest evidence Plaintiffs present of a common objective is an email from Hammes summarizing negotiations with Icahn and Rachesky, in which Hammes states that both investors "want[ed] two seats" and wanted Navistar to "offer two seats to the other [investor] and then [they] would consider a standstill." (DRPF ¶ 45.) However, this single line in an email summarizing the investors' negotiating position at one point in time during ongoing negotiations is not sufficiently probative to create a factual dispute precluding summary judgment.[8] And Hammes later testified that his email did not accurately capture the investors' negotiating positions, as he clarified that Icahn and Rachesky each sought two seats but never demanded that Navistar also give two seats to the other. (DRPSF ¶ 45.) Similarly, Icahn denied ever advocating for Rachesky to receive any Board seats. Rather, Icahn's attitude toward Rachesky was "screw him, pretty much." (Defs.' Resp. to Pls.' Statement of Additional Facts ("DRPSAF") ¶ 7, Dkt. No. 177.)

Furthermore, the facts surrounding the execution of Icahn's and Rachesky's respective settlement agreements with Navistar weigh against a finding of coordination between the two investors. Initially, an offer was extended only to Icahn. (PRDSF ¶ 69.) That offer provided that if

---

[8] While Navistar did not object to this evidence as hearsay, the Court notes that this email raises hearsay concerns to the extent it is introduced to prove that Icahn and Rachesky actually had a common objective to ensure that they each got two Board seats. *See, e.g.*, *Chase v. Consol. Foods Corp.*, 744 F.2d 566, 571 (7th Cir. 1984) (noting that a memo addressing negotiations with a potential lender stating that the lender liked a proposed deal would be hearsay if introduced to show that the potential lender actually liked the deal). But even if it could be presented to the Court in admissible form, it would not be sufficient to create a triable issue of fact on its own.

Icahn signed the settlement agreement, the same deal would be presented to Rachesky. (*Id.*) And the number of Board seats that Icahn would receive was contingent upon whether Rachesky accepted the offer presented to him. (*Id.*) If Rachesky also accepted the offer, then he and Icahn would each get one Board seat and they could jointly propose a Mutual Designee to fill a third seat. (*Id.*) If Rachesky rejected the offer, however, Icahn would get two seats and Rachesky would receive zero. (*Id.*) Notably, Rachesky was not informed of the proposed settlement agreement until Icahn had already signed onto it. (*See* Defs.' Statement of Uncontested Facts, Ex. F-75 at NAVDEF00013112, Dkt. No. 143-14.) And the only reason the settlement agreements mirrored one another was because Rachesky requested that Icahn's agreement be amended to look like his so that the press would not think that Icahn went first and "cornered" Rachesky. (PRDSF ¶ 71; PRDSAF ¶ 8.)

Taken together and viewed in the light most favorable to Plaintiffs, the evidence shows, at most, parallel conduct on the part of Icahn and Rachesky. But parallel conduct alone does not suffice to demonstrate that the two investors acted as a group; what is needed is evidence of an agreement to pursue a common objective with respect to acquiring, holding, voting, or disposing of securities. *Litzler v. CC Invs., LDC*, 411 F. Supp. 2d 411, 415 (S.D.N.Y. 2006); *see also Luther II*, 2017 WL 1197103, at *8 (finding that a group would not be found if Icahn and Rachesky had "no other goal than to secure seats for each investor"). Because the record as a whole could not lead a rational trier of fact to find that Icahn and Rachesky agreed to pursue a common objective with respect to their Navistar shares, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Consequently, Navistar's motion for summary judgment is granted with respect to Plaintiffs' group theory.

29

### C. Plaintiffs' Threatened Election Contest Theory

There is no dispute that a total of five members of Navistar's Board were replaced during the 36-month period preceding Plaintiffs' termination from the company. According to Plaintiffs, the record evidences no genuine dispute of material fact that at least three of those Board members (*i.e.*, enough to constitute a change of control under paragraph 3(b) of the ESA) were replaced "in connection with an actual or threatened election contest." While they concede there was no actual election contest at Navistar, Plaintiffs nonetheless contend that the evidence establishes that Icahn and Rachesky both threatened an election contest that led to the turnover of at least three Navistar Board seats. Therefore, they request that summary judgment be entered in their favor as to their entitlement to change-in-control termination benefits under paragraph 3(b) of the ESA. Navistar does not contest that the turnover of at least three Board members in connection with a threatened election contest would satisfy the threshold set out in the ESA. However, it argues that it should be awarded summary judgment on the threatened election contest theory because the undisputed material evidence shows that there was no threatened election contest and even if there were, no Board members were replaced in connection with any threat.

#### 1) Interpretation of "Threatened Election Contest"

To resolve the parties' cross-motions on the threatened election contest theory, the Court must interpret the terms of the ESA. Because the ESA is an ERISA-governed plan (*see* DRPSF ¶ 1), the Court applies federal common law rules of contract interpretation. *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 823 (7th Cir. 2010). Under federal common law, "contract language is given its plain and ordinary meaning." *Id.* "Contracts must be read as a whole, and the meaning of separate provisions should be considered in light of one another and

the context of the entire agreement." *Id.* In interpreting an ERISA plan, the first task for the Court is to determine whether "the contract at issue is ambiguous or unambiguous." *Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 873 (7th Cir. 2001). "Contract language is ambiguous if it is susceptible to more than one reasonable interpretation." *Id.* Where the terms of an ERISA plan document are unambiguous, a court "need not consider extrinsic evidence and should proceed to declare the meaning of the provision." *Id.* (internal quotation marks omitted).

Here, neither Plaintiffs nor Navistar believe that the phrase "threatened election contest" is ambiguous—although each side advances a different interpretation of the phrase. The parties have no dispute that a proxy fight constitutes one form of "election contest." Instead, their disagreement focuses on the proper meaning of the word "threatened." According to Plaintiffs, "threatened" has an easily understood meaning that can be found in an ordinary dictionary. By contrast, Navistar contends that for an election contest to be "threatened," an investor must take concrete, objective steps toward running an election contest. The Court agrees that the word threatened is unambiguous and concludes that the proper interpretation is in line with the one advanced by Plaintiffs.

In interpreting the word "threatened," the Court is mindful that it must "interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience." *Bullwinkel v. New Eng. Mut. Life Ins. Co.*, 18 F.3d 429, 431 (7th Cir. 1994) (internal quotation marks omitted). Where a disputed contract term "involves a plainly descriptive term that lends itself straightforwardly to dictionary definition," recourse to dictionaries is appropriate. *Bock v. Comput. Assocs. Int'l, Inc.*, 257 F.3d 700, 706 (7th Cir. 2001). The word "threatened," as used in the ESA, is the past participle of the word "threaten," which has a common and unambiguous meaning easily understood by the ordinary person. "Threaten" most commonly is used to mean

"to utter threats against," but can also mean "to give signs of warning of" or to "hang over dangerously." *Threaten*, Merriam-Webster, https://www.merriam-webster.com/dictionary/threaten (last visited Nov. 25, 2020). And "threat" is understood to mean "an expression of intention to inflict evil, injury, or damage" or "an indication of something impending." *Threat*, Merriam-Webster, https://www.merriam-webster.com/dictionary/threat (last visited Nov. 25, 2020). Thus, as used in the ESA, a "threatened" election contest should be deemed to have occurred if Icahn or Rachesky, by words or conduct, expressed or gave some indication of an intent to wage a proxy fight for control of seats on Navistar's Board.

While the word "threatened," by itself, does not require a substantial, legitimate, or credible threat of an election contest, such limiting qualifications are implicit when the phrase "threatened election contest" is read in context with the rest of the ESA. First, the ESA states that change-in-control termination benefits are provided in recognition that the "***possibility***" of a change in control "may negatively affect the retention of senior management personnel" and their decisionmaking, among other things. (DRPSF ¶ 4 (emphasis added).) As Navistar's expert explains, "change in control provisions developed to reassure executives when the company's control is in play that they will be taken care of." (PRDSF ¶ 8.) Thus, a hollow threat that does not portend a realistic possibility of a change in control will not produce the negative effects against which the entitlement to greater severance payments was meant to counteract. Moreover, common sense dictates that there is no plausible scenario in which paragraph 3(b) would actually be triggered by anything less than a credible threat of an election contest, given that the paragraph addresses circumstances where a Board member is replaced "in connection with" a threatened election contest. For example, it is implausible that a large corporation like Navistar would feel pressure to replace members of its Board based on threats of a proxy fight from an average

individual investor with a miniscule ownership interest in the company. Indeed, no reasonable company would replace Board members "in connection with" a threatened election contest if it did not believe that it faced a real and substantial possibility that the investor would act upon his threat. Thus, in evaluating whether the evidence demonstrates that any Board member was replaced in connection with a threatened election contest, whether Navistar actually believed that there was a substantial likelihood that Icahn or Rachesky would wage a proxy fight if it did not replace the Board member is a relevant consideration. The fact of replacement and Navistar's perception of a credible threat of a proxy fight can, in some instances, at least create a fact issue as to the connection between the two.

Navistar argues that an election contest is not "threatened" unless an investor takes substantial, objective, concrete steps toward running an election contest. Citing Rock's expert report, Navistar claims the steps an investor must take to run a proxy fight include:

> (i) acquiring a large block of stock to demonstrate seriousness and in order to profit; (ii) identifying director candidates that the other shareholders will want to vote for; (iii) preparing a proxy statement that must be filed and approved by the SEC; (iv) satisfying the advance notice bylaws of the company; (v) retaining proxy solicitors and public relations professionals; (vi) meeting with the proxy advisory firms such as ISS and Glass Lewis; and then, once the proxy statement is filed; (vii) actually launching the contest, which involves intense efforts over several months to solicit and re-solicit shareholder support, involving telephone solicitations that may include millions of calls to shareholders, further communications, and, inevitably various legal controversies along the way.

(PRDSF ¶ 13.) But that definition would be inconsistent with the ordinary and plain meaning of the word "threatened." Certainly, a person of average intelligence and experience would not understand that an election contest is not "threatened" until actual concrete steps toward running one have been taken. *Cf. United States v. Dutcher*, 851 F.3d 757, 761 (7th Cir. 2017) ("A true threat does not require that the speaker intend to carry it out, or even that she have the capacity to do so.").

Nonetheless, Navistar argues that the phrase "threatened election contest" must be read together with the language immediately following it: "including, but not limited to, a consent solicitation, relating to the election of directors of the Company." According to Navistar, the phrase "threatened election contest" is modified by the ESA's reference to a consent solicitation.[9] It contends that because a consent solicitation, like a proxy fight, requires an investor to take several substantial, objective, concrete steps to commence the solicitation, a "threatened" election contest should be understood to occur only if such steps are taken; otherwise there would be no reason to refer to consent solicitation immediately after "threatened election contest." This contention is unpersuasive. There is an obvious reason for the ESA to use the consent solicitation exemplar preceded by the phrase "including, but not limited to," and that is to make clear that an election contest may occur by way of a consent solicitation. By itself, an election contest is ordinarily understood to require a vote; whereas a consent solicitation, by definition, does not. *See* Del. Code Ann. tit. 8 § 228. Thus, to avoid confusion, the ESA lists a consent solicitation as an example to broaden the meaning of election contest to include similar procedural mechanisms that do not require a vote.

Navistar also contends that extrinsic evidence supports its interpretation of the phrase "threatened election contest." However, this Court has already found that Navistar's interpretation of the phrase is not a reasonable interpretation, whereas Plaintiffs' interpretation is a reasonable

---

[9] For companies like Navistar that are incorporated in the state of Delaware, any action that must or may be taken at any annual or special meeting of stockholders of a corporation

> may be taken without a meeting, without prior notice and without a vote, if a consent or consents, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

Del. Code Ann. tit. 8 § 228(a).

and natural reading of the plain language of the ESA. *See Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir. 1995) ("[A] contract is ambiguous only if both parties were reasonable in adopting their different interpretations of the contract."). Having found the phrase "threatened election contest" to be unambiguous, the Court rejects any extrinsic evidence offered by Navistar to create ambiguity. *Id.* ("[A]lthough extrinsic evidence can be used to show that a contract is ambiguous, extrinsic evidence cannot be used to ***create*** an ambiguity." (citations omitted)); *see also Swaback v. Am. Info. Techs. Corp.*, 103 F.3d 535, 541 (7th Cir. 1996) ("Extrinsic evidence should not be used where the contract is unambiguous." (internal quotation marks omitted)).

In any case, the Court finds Navistar's main evidence of ambiguity insufficient. In particular, Navistar relies on a statement in the declaration of the company's general counsel that Navistar has always interpreted the phrase "threatened election contest" as requiring substantial, objective, concrete steps toward running an election contest. (PRDSF ¶ 117.) However, "the fact that one party to the agreement intends that the terms have something other than their plain and ordinary meaning is irrelevant unless both parties share the same meaning, or one party knew, or had reason to know, the meaning intended by the other party." *Bock*, 257 F.3d at 708 (citations omitted). And Navistar presents no evidence demonstrating that either Plaintiff shared Navistar's understanding of the phrase "threatened election contest" at they time they entered into the ESA.

Finally, the Court rejects Navistar's public policy arguments in support of its interpretation of the ESA. This Court is "restricted by federal common law rules of contract interpretation to view the language of the [ESA] to determine where the parties' minds met." *Bullwinkel*, 18 F.3d at 431. Therefore, it "must give effect to the words which denote the bargain, not in light of public policy considerations, but in light of their plain meaning." *Id.* Here, the plain and ordinary meaning of "threatened election contest" is unambiguous. It does not require that an investor take

substantial, objective, and concrete steps toward running an election contest. Instead, it simply requires that an investor communicate their intent to run an election contest.

### 2) Whether There Was a Threatened Election Contest

Having found that "threatened election contest" has an unambiguous meaning, the Court proceeds to determine whether the undisputed evidence conclusively answers whether a threatened election contest occurred. Put differently, the Court must determine whether Icahn or Rachesky or both, by words or conduct, expressed or gave some indication of an intent to wage a proxy fight for control of seats on Navistar's Board.

As an initial matter, the Court agrees with Navistar that the fact that Icahn and Rachesky were owners of a substantial number of Navistar's shares who were seeking Board representation, by itself, does not mean that either threatened an election contest. As Navistar's expert explains, in the modern corporate landscape, there is a "risk or possibility of a proxy contest whenever an activist [institutional investor] takes a position in a company." (PRDSF ¶ 9.) And while it is not uncommon for an activist investor to seek an active role in the companies in which they invest, including through Board representation, proxy contests are rare. (*Id.* ¶¶ 10, 12.) Rather, companies frequently "agree to nominate candidates for the board of directors recommended by large shareholders" and, in exchange, for those investors to enter into standstill agreements, which usually include a provision that precludes the investor from running an election contest. (*Id.* ¶ 11.) Thus, given the cooperation that frequently occurs when an activist investor seeks Board representation, the mere request for a Board seat (accompanied by an investor's large stake in a company) cannot be deemed to constitute a threat to wage a proxy fight.

Both Icahn and Rachesky, by virtue of their substantial stake in Navistar, presented a risk of a proxy fight. Indeed, there is evidence in the form of presentations from third-party advisors

and the minutes of Board meetings that Navistar perceived a risk of a proxy fight from both investors.[10] But for purposes of summary judgment, the question is whether there is evidence that either of them engaged in some further conduct that gave Navistar a reason to believe that such a risk would materialize. As to Rachesky, such evidence is lacking. On the contrary, Rachesky never issued any public statement or made any SEC filing threatening the possibility of an election contest. (PRDSF ¶ 77.) Rachesky himself stated that he did not even know how to threaten a proxy fight and he had never previously undertaken or threatened one because he was a "constructionist" and "friendly shareholder" who liked to work with a company's management. (PRDSF ¶¶ 76–77.) Even Plaintiffs concede that Rachesky did not expressly threaten a proxy fight. Instead, they claim that Navistar's perception that it faced a risk of a proxy fight from Rachesky is enough to establish that he threatened an election contest. But, as discussed above, given that there is arguably an implicit risk of a proxy fight from any activist investor, Navistar's perception alone cannot establish a threatened election contest without some further affirmative act by Rachesky.

By contrast, twice in September 2012, Icahn made public statements that the Court finds could qualify as threatening an election contest. First, in his September 9, 2012 open letter to Navistar, Icahn stated: "I would prefer to amicably resolve this matter now, rather than through protracted litigation and a proxy fight. However, I am sure you have no doubt that I will proceed with both, if necessary . . . ." (DRPSF ¶ 35; PRDSF ¶ 58.) Certainly, Navistar, by denouncing Icahn's "unproductive tactics of threats, attacks, and disruption," apparently understood Icahn to

---

[10] Navistar objects to evidence of the third-party advisors' presentations to the Board as inadmissible hearsay to the extent used for the truth of the matter asserted. However, the Court finds that such evidence is not hearsay when it is used to demonstrate Navistar's perception of the risk presented by either Icahn or Rachesky. *See* Fed. R. Evid. 801(c); *see also United States v. Hanson*, 994 F.2d 403, 406 (7th Cir. 1993) ("An out of court statement that is offered to show its effect on the hearer's state of mind is not hearsay.").

be issuing a threat. (DRPSF ¶ 36.) Then, in his September 11, 2012 press release, Icahn again made a threat when he said "I would prefer to amicably resolve this matter with Navistar and not engage in the tiresome and expensive process of protracted litigation and a proxy fight," but would have no choice but to do things "the hard way" if Navistar did not recognize his right to have representation on the company's Board. (DRPSF ¶ 37; PRDSF ¶ 60.) Both statements could be construed as Icahn communicating his intent to wage a proxy fight if the Board did not accede to his request for Board representation. After his press release, Icahn issued a books and records demand. While the demand letter listed many purposes for which it requested the records, one of those purposes was to determine "whether and how to conduct a proxy contest." (DRPSF ¶ 37.)

Despite Icahn's seemingly unequivocal expression of his intention to undertake a proxy fight if necessary, Navistar points to Icahn's testimony that his language threatening a proxy fight was "boilerplate." (*Id.*) But Navistar cannot wave away Icahn's multiple publicly issued threatening statements as mere boilerplate and expect to win summary judgment. The boilerplate explanation is further belied when, the day after his second threat, Icahn responded to Navistar's offer of three Board seats to split between him and Rachesky by saying "it's four or war." (DRPSF ¶ 40.) At minimum, whether Icahn's threats were "boilerplate" is a factual issue for trial. For that reason, the Court cannot conclude as a matter of law that there was no threatened election contest.

### 3)  Whether Board Members Were Replaced "In Connection With" Icahn's Threat

While a reasonable fact-finder could find that Icahn's public statements and conduct conveyed to Navistar that he intended to run a proxy fight if Navistar did not meet his demands for Board representation, the Court must still determine whether at least three Board members were replaced "in connection with" Icahn's threats. As discussed above, this analysis initially

requires the Court to determine whether Navistar understood that Icahn was making a credible threat because it would be unreasonable to assume that Navistar would replace Board members in connection with a threat that the company understood to be empty.

Here, there is evidence supporting both Plaintiffs and Navistar's respective positions as to whether Navistar understood that Icahn was making a credible threat to run a proxy fight. Plaintiffs point to evidence showing that, well before September 2012, Navistar perceived that it faced a risk of a proxy fight from both Icahn and Rachesky. As early as September 2011, after Icahn's initial investment, a Navistar outside advisor warned the company that it faced a risk of a proxy fight from Icahn. (DRPSF ¶ 9.) After Rachesky's investment, Navistar had several meetings with another outside advisor, Goldman Sachs, where Navistar received presentations on potential proxy fight scenarios involving Icahn and Rachesky as well as advice on how to eliminate the risk that either would run a proxy fight. (*Id.* ¶¶ 13, 18, 20, 22, 24.) Plaintiffs also point to evidence and testimony indicating that certain executives and Board members believed that Icahn could run a proxy fight. For example, when Campbell assumed the positions of CEO and Executive Chairman of the Board, Hammes warned Campbell that Navistar "ought to be careful" of the risk of a proxy fight from Icahn or Rachesky. (*Id.* ¶ 27.) In addition, Clarke,[11] who was then serving as Navistar's Chief Operating Officer, told an associate that Campbell was brought in to "fight off a proxy fight" from the two investors. (*Id.*) And in September, Clarke wrote to an associate that Navistar's Board was "preparing for a proxy fight or at least a discussion to avoid one." (*Id.* ¶ 31.) After Icahn made his public statements apparently threatening a proxy fight, the Saratoga Committee held two meetings to discuss steps to take in event of a

---

[11] Navistar argues that Clarke's understanding of the risk posed by Icahn and Rachesky is entitled to limited weight because he was not involved in the Board's negotiations with the investors. However, that argument goes to the credibility of Clarke's testimony and cannot be resolved on summary judgment. *E.g.*, *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

proxy fight. (*Id.* ¶ 41.) Further, one of the members of the Saratoga Committee, Keyes, stated that he understood that the language in Icahn's September 11 press release represented a threat to run a proxy fight. (PRDSF ¶ 90.) In short, Plaintiffs have set forth evidence showing that Navistar perceived a real threat of a proxy fight from Icahn and could easily have viewed his public statements indicating his intention to do so as credible.

On the other hand, Navistar sets forth evidence supporting its own claim that Navistar did not truly believe that Icahn would actually proceed with a proxy fight. Indeed, Campbell claimed that he did not believe Icahn's public statements were threatening a proxy fight but instead believed those statements were "another example of his bluster." (*Id.* ¶ 89.) Similarly, Hammes testified that Icahn could "say lots of things" but "[t]hat's different than a threat. That's just mentioning a bunch of positioning." (*Id.* ¶ 88.) Icahn himself denied that his public statements were intended to threaten a proxy fight or that he wanted Navistar to believe he would wage a proxy fight. (*Id.* ¶ 64.) Rather, he said the reason he sent the first letter was "to put pressure on the Board . . . . because [he] knew that their Achilles heel was they were worried about being sued." (*Id.* ¶ 59.) When asked what he meant when he claimed that he was willing to do things "the hard way," Icahn stated that "'the hard way' could be suing Navistar." (*Id.* ¶ 62.) Moreover, Icahn testified that a proxy fight with Navistar would not even have been feasible because Rachesky owned too many shares of the company. (*Id.* ¶ 79.) That testimony is backed up by Navistar's expert, who opined that a proxy contest "would simply not be plausible in a company like Navistar in 2012–2014 with a 13% holder [Rachesky] allied with management." (*Id.* ¶ 85.) And Icahn claimed that Navistar told him that it recognized that he would not be able to run a proxy fight because of Rachesky. (*Id.* ¶¶ 82, 84.)

Thus, Navistar can point to evidence supporting its claim that it did not perceive Icahn's public statements to be making a serious threat to wage a proxy fight. Such evidence tends to undermine Plaintiffs' claim of a connection between the replacement of Board members and Icahn's threats. In addition, Navistar also can point to evidence of other reasons for why the company entered into a settlement agreement with Icahn other than to avoid a proxy fight. As discussed above, Navistar cites evidence that supports its claim that the real threat posed by Icahn was the threat of litigation. (*Id.* ¶¶ 59–60, 88, 90.) Indeed, in his public statements, Icahn's threats to run a proxy fight are accompanied by threats of litigation. (DRPSF ¶¶ 35, 37; PRDSF ¶¶ 58, 60.) In addition, at the time that Icahn made his threats, Navistar's business had experienced a series of setbacks that had harmed the company's value. (PRDSF ¶ 29–31; 44.) Given the challenges facing Navistar, there was an incentive "to resolve any issues with shareholders, not just Icahn, in a friendly way because [Navistar] needed to settle down all the publicity and all that" and the company believed that Icahn and Rachesky's support for the Board would "calm down the whole uncertainty and consternation [Navistar] had throughout [its] whole investor base." (*Id.* ¶ 67.) And Navistar perceived that it would benefit from Icahn having a representative on the Board as having his expertise would likely earn the confidence of many of the company's investors. (*Id.* ¶ 68.)

When the Court views the evidence in the light most favorable to either party, it finds a triable issue of fact as to whether there was a connection between the turnover of Board seats and Icahn's threat to run a proxy fight. Plaintiffs come forward with evidence showing that Navistar perceived a threat of a proxy fight from Icahn and may have understood his public statements to be an expression of his serious intention to move forward with a proxy fight. On the other hand, Navistar has evidence suggesting that the company knew that Icahn was bluffing, perhaps as a

negotiating tactic, and agreed to replace Board members not because Icahn threatened a proxy fight but because he threatened litigation or simply because it benefited the company to have Icahn's support for the Board. Given that the evidence supports multiple explanations for why Navistar ultimately settled Icahn's demand for Board representation, the resolution of that issue must await trial.

However, Navistar claims that even if there was a connection between Icahn's threats and Navistar's decision to give him representation on the Board, Icahn's threats can only account for the turnover of two Board seats. Put differently, Navistar argues that Icahn's threats cannot be attributed to Rachesky and the Board seat he obtained under his settlement agreement with Navistar. And if Rachesky's Board seat cannot be attributed to Icahn's threat, then Plaintiffs fall short of demonstrating the requisite change in Board composition to trigger a change in control.

In making its argument that Rachesky's Board seat cannot be attributed to Icahn's threat, Navistar contends that the phrase "in connection with" must be construed to require a direct causal relationship between the change in Board seats and the threat. But, if Navistar wanted to require a direct causal relationship, it could have used more precise language in the ESA rather than the broad phrase "in connection with." That phrase has been described as "*always* a vague, loose connective." *In connection with*, Garner's Dictionary of Legal Usage (3d ed. 2011) (emphasis added). It "is used to capture a wide variety of different relationships." *United States v. Loney*, 219 F.3d 281, 284 (3d Cir. 2000). In fact, the Seventh Circuit has found that the common, ordinary meaning of "in connection with" requires the phrase to be construed expansively. *United States v. Wyatt*, 102 F.3d 241, 247 (7th Cir. 1996). There is nothing in the text of the ESA indicating that "in connection with" should be interpreted more narrowly than its ordinary and common meaning. Rather, the Court believes that the phrase requires simply that there be a

"logical relationship" between Icahn's threat and the turnover of a Board seat. *See Da Silva v. Att'y Gen. U.S.*, 948 F.3d 629, 636 (3d Cir. 2020) ("[T]he term 'connected to' means having a causal or logical relationship." (internal quotation marks omitted)).

If it were determined at trial that there was a connection between Icahn's threat and the settlement agreement he entered with Navistar, that connection could very well extend to Navistar's decision to give Rachesky a seat on the Board. Indeed, there is evidence that Navistar believed it had to reach an outcome agreeable to both investors to ward off the risk of a proxy fight. Even though Rachesky had not actually threatened a proxy fight, Navistar believed that settling with Icahn alone might shift the risk of a proxy fight to Rachesky. (DRPSF ¶ 39.) Thus, the two investors' demands for Board representation were connected because Navistar viewed a joint resolution as necessary so that no investor felt like the other got a better deal at his expense. Furthermore, Rachesky only received his Board seat because it was provided for by the express terms of Icahn's settlement agreement. Therefore, Navistar is incorrect in arguing that Rachesky's Board seat could not be attributed to Icahn's threat.

Since there are disputed issues of fact regarding whether three or more Board members were replaced in connection with a threatened election contest, the issue must be decided at trial. Consequently, both motions for summary judgment are denied.

### D.    General Release

Finally, in opposing Plaintiffs' motion for summary judgment, Navistar contends that Sharp waived his claim to change-in-control severance payments when he signed the General Release. In signing the General Release, Sharp agreed that he was waiving all claims for any act occurring prior to the date of his signing the General Release other than his right to enforce the

terms of the ESA. (PRDSAF ¶ 68.) Navistar argues that Sharp's claims in this matter were covered by the General Release.

This issue was raised in the *Luther* case, prior to reassignment. The predecessor judge held that Luther's claim that he was owed change-in-control benefits was preserved because it "turn[ed] on the proper application of the ESA." *Luther I*, 2016 WL 3568809, at *5. Navistar recognizes that ruling but maintains its disagreement with it and asks this Court to make its own finding as to Sharp. This Court finds no reason to revisit the decision or otherwise to decline to apply the predecessor judge's same rationale to Sharp.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motions to bar the report of Navistar's expert witness (*Sharp*, Dkt. No. 134; *Luther*, Dkt. No. 193) are granted in part and denied in part. Navistar's motions for summary judgment (*Sharp*, Dkt. No. 138; *Luther*, Dkt. No. 194) are granted as to Plaintiffs' group theory and denied as to Plaintiffs' threatened election contest theory. Plaintiffs' motions for partial summary judgment (*Sharp*, Dkt. No. 136; *Luther*, Dkt. No. 192) are denied.

ENTERED:

Dated:  November 30, 2020

_____
Andrea R. Wood
United States District Judge